111 F.3d 1099
 65 USLW 2714
 Robert J. TOLCHIN, individually and on behalf of all others
similarly situated, Appellant,
v.
The SUPREME COURT OF THE STATE OF NEW JERSEY, Robert Wilentz
(intended to be the Chief Judge of the Supreme Court of New
Jersey): Stephen W. Townsend (intended to be the clerk of
the Supreme Court): the New Jersey State Board of Bar
Examiners; Samuel J. Uberman (intended to be the Assistant
Secretary of the New Jersey Supreme Court who plaintiff
believes to direct the State Board of Bar Examiners); the
New Jersey Institute for Continuing Legal Education; Joseph
J. Hogya (intended to be the Institute for Continuing Legal
Education Skills Training Course Director).
 No. 95-5883.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 10, 1996.
Decided May 2, 1997.
 
 Robert J. Tolchin, New York City, Pro Se.
 David Jaroslawicz (argued), Yaroslawicz & Jaros, New York City, of counsel, for Appellant.
 Jeffrey J. Miller (argued), Office of Attorney General of New Jersey, Division of Law, Trenton, NJ, for Supreme Court of New Jersey, Robert N. Wilentz, Stephen W. Townsend, The New Jersey Board of Bar Examiners, and Samuel J. Uberman.
 William B. McGuire (argued), Tompkins, McGuire & Wachenfeld, Newark, NJ, for New Jersey Institute for Continuing Legal Education and Joseph J. Hogya.
 Michael S. Fettner, Lyman & Ash, Philadelphia, PA, Amicus-Appellant.
 Before: SLOVITER, Chief Judge, COWEN and LEWIS, Circuit Judges.
 OPINION OF THE COURT
 LEWIS, Circuit Judge.
 
 
 1
 To practice law in New Jersey, an otherwise qualified attorney must maintain an office and attend continuing legal education courses there. The question before us is whether such requirements are lawful. We conclude that they are, and thus will affirm the district court's grant of summary judgment in favor of the Appellees.
 
 I.
 
 2
 Rule 1:21-1(a) of the Rules Governing the Courts of the State of New Jersey (the "Rule") indicates who may practice and appear in New Jersey courts. The New Jersey Supreme Court amended this Rule, effective September 1, 1996, while this appeal was pending. The Rule now states that
 
 
 3
 no person shall practice law in this State unless that person is an attorney, holding a plenary license to practice in this State, has complied with the R.1:26 skills and methods course requirement in effect on the date of the attorney's admission, is in good standing, and maintains a bona fide office for the practice of law in this State regardless of where the attorney is domiciled.
 
 
 4
 N.J.Ct.R. 1:21-1(a) (1996) (emphasis added).
 
 A.
 The Bona Fide Office Requirement
 
 5
 The Rule defines "bona fide office" as "more than a maildrop, a summer home that is unattended during a substantial portion of the year, an answering service unrelated to a place where business is conducted, or a place where an on-site agent of the attorney receives and transmits messages only." Id.
 
 
 6
 The Rule also outlines some indicia of a bona fide office. It
 
 
 7
 is a place where clients are met, files are kept, the telephone is answered, mail is received and the attorney or a responsible person acting on the attorney's behalf can be reached in person and by telephone during normal business hours to answer questions posed by the courts, clients or adversaries and to ensure that competent advice from the attorney can be obtained within a reasonable period of time.
 
 
 8
 Id.
 
 
 9
 The bona fide office requirement is the successor to New Jersey's more stringent residency requirement for members of the New Jersey bar. Indeed, as we discuss below, over the years New Jersey has sought to diminish the disparity in treatment between resident and nonresident attorneys. Moreover, the history of New Jersey's residency and bona fide office requirements demonstrates the interests at stake in this case. As we will explain, each revision has sought to strike a different balance of the public interest, the interests of the New Jersey bar and the interests of potential members of the bar. Because those interests are at the core of the dispute in this case, we will briefly trace the relevant history and meaning of the various revisions to the Rule.
 
 
 10
 At the outset we note that until 1969, New Jersey required that attorneys be residents of New Jersey in order to practice there. In re Sackman, 90 N.J. 521, 448 A.2d 1014, 1017 (1982); see Pressler, Current New Jersey Court Rules, Comment R. 1:21-1 (1969). The rationale for this requirement was that "residence in New Jersey implies a community commitment in terms of both interest and activity which better serves local clients and their interests." Editorial, Proposed Revision of the Rules of the Court, 90 N.J.L.J. 164 (1967) ("1967 Editorial"). Supporters of the residency requirement maintained that it ensured that the general public had access to qualified and committed counsel. Id. But while the residency requirement was in effect until 1969, the New Jersey Supreme Court had been considering revising it since 1960.
 
 
 11
 In 1960, the New Jersey Supreme Court appointed the Coordinating Committee on the Revision of the Rules of Court to review the state's rules of court, including the residency requirement. Sackman, 448 A.2d at 1017.
 
 
 12
 In 1966, the Committee recommended that the residence requirement be modified so that a nonresident attorney could practice law in New Jersey as long as he or she was "in regular attendance at an office in this state maintained for the practice of law." 1967 Editorial; see Sackman, 448 A.2d at 1017. This proposed revision was intended to benefit attorneys who chose to live in New York or Pennsylvania and to practice in New Jersey. 1967 Editorial. These attorneys argued that the residency requirement placed an unreasonable restriction on their choice of residence because they were equally--if not more--qualified to practice in New Jersey than resident attorneys who primarily practiced in another state. Id. The proposed revision was tailored to prevent the occasional practice of law by those who practiced primarily in another state. Sackman, 448 A.2d at 1017.
 
 
 13
 The 1966 recommendation was criticized for several reasons. First, it was unclear what "regular attendance" meant. 1967 Editorial. Critics suggested that the proposed revision would allow attorneys who predominantly practiced in New York or Philadelphia to meet the requirement by attending a New Jersey office on a regular but infrequent basis. Id. Furthermore, some members of the New Jersey bar feared that this revision would make it more difficult for people to secure qualified and committed counsel. Id. They believed that New Jersey residents would be better served by local counsel who would be "presumably, better equipped, in terms of currency and facility with New Jersey law and practice." Id. Finally, the proposal was criticized because of its "adverse impact on the economic interests of the New Jersey bar...." Id. The proposal was not implemented.
 
 
 14
 In 1969, the Coordinating Committee proposed another revision which allowed any attorney to practice in New Jersey who was either domiciled there or maintained his or her principal office there. Sackman, 448 A.2d at 1017. While allowing for a more expansive choice of residence for members of the New Jersey bar, this recommendation implicitly rejected the possibility of attorneys engaging in multi-state practice. Id. The New Jersey Supreme Court implemented this recommendation. Id.
 
 
 15
 However, the 1969 Rule failed to limit multi-state practice completely. Some attorneys practiced in New Jersey by virtue of their residency in the state, but did not maintain a bona fide office there either because their office was in another state or because their New Jersey practice was irregular. Pressler, Current New Jersey Court Rules, Comment R. 1:21-1 (1982).
 
 
 16
 Thus, effective September 1978, the Rule was amended again to require that a resident attorney maintain a bona fide office in New Jersey and that a nonresident attorney maintain his or her principal office there. Id. This version of the Rule was more restrictive of nonresidents than of residents because only the former had to maintain their principal offices in New Jersey. As a result of this requirement, a nonresident attorney's New Jersey practice could not be subordinate to a practice in another state. Id.
 
 
 17
 "Bona fide office" was not defined in the 1978 Rule, leading to another amendment in September, 1981. This amendment defined a bona fide office as
 
 
 18
 a place where the attorney or a responsible person acting on his behalf can be reached in person and by telephone during normal business hours. A bona fide office is more than a maildrop, a summer home that is unattended during a substantial portion of the year, or an answering service unrelated to a place where business is conducted.
 
 
 19
 Sackman, 448 A.2d at 1018; N.J.Ct.R. 1:21-1(a) (1983).
 
 
 20
 In 1982, the New Jersey Supreme Court, as part of its decision in Sackman, amended the Rule again in order to excise the facial discrimination against nonresidents. Under the revised Rule, both residents and nonresidents had to maintain bona fide offices in New Jersey in order to practice there. Sackman, 448 A.2d at 1019.
 
 
 21
 Before the Sackman revision, the Rule presumed that without a principal office in New Jersey, an attorney would lose contact with New Jersey law and procedure, and would therefore be unable to serve clients competently. Id. But the Court observed that to the extent this premise might be true, it is only marginally true. Id. at 1021. The Court concluded that "the public would be better served if licensed New Jersey attorneys residing, for example, in New York and Philadelphia were subject to no greater restrictions in their practice in New Jersey than those residing in Newark and Camden" because more qualified attorneys would be available to the New Jersey public. Id. at 1019.
 
 
 22
 From 1982 to 1996, the only official changes made to the Rule were not substantive. However, in 1994, following a formal hearing concerning a bar member who had attempted to satisfy the bona fide office requirement by renting, but not actually using, office space in New Jersey, the Committee on Attorney Advertising, appointed by the New Jersey Supreme Court, issued Opinion 19 to clearly define "bona fide office." 138 N.J.L.J. 320. The Committee recommended that the attorney be disciplined and stated that a bona fide office had to be "a place where clients are met, files are kept, the telephone is answered, mail is received and a responsible person acting on the attorney's behalf can be reached during normal business hours." Id. In 1996, the New Jersey Supreme Court adopted the substance of Opinion 19 in its revision of the Rule. N.J.Ct.R. 1:21-1 (1996).
 
 
 23
 Thus, there is no question that over the last few decades, New Jersey has sought to reduce facial discrimination against nonresident attorneys. There is also no question that the bona fide office requirement imposes at least some restriction on all attorneys who wish to practice in New Jersey. One of the issues in this appeal is the extent to which these restrictions impose a burden that unconstitutionally discriminates against nonresident attorneys.
 
 B.
 
 24
 The Continuing Legal Education Mandatory Attendance Requirement
 
 
 25
 In addition to the bona fide office requirement, successful completion of the skills and methods course on New Jersey practice is required for all attorneys recently admitted to the New Jersey bar. N.J.Ct.R. 1:26. The course is intended to prepare attorneys for the transition to legal practice in New Jersey from law school or from legal practice in another state. The New Jersey Supreme Court approved the New Jersey Institute for Continuing Legal Education ("ICLE") to administer this course.
 
 
 26
 In January 1987, the New Jersey Supreme Court directed ICLE to enforce a mandatory attendance policy for all registrants of the skills and methods course (the "mandatory attendance requirement"). ICLE implemented this directive after an extensive evaluation that included public notice of the proposal. ICLE currently offers the skills and methods course in four cycles throughout the year in three different scheduling formats. Newly admitted attorneys are free to choose the most convenient course cycle and format. The first year requirement for the course requires an attorney to attend 40 hours of lectures. Attendance is mandatory in all cycles and formats. Rule 1:26 provides that "failure to complete the course successfully shall render an attorney ineligible to practice law."
 
 II.
 
 27
 Appellant Robert Tolchin is a resident of New York State. He graduated from Cardozo Law School in 1992, sat for and passed the New Jersey Bar Exam in July, 1992, and was sworn in to the New Jersey bar in December, 1992. Tolchin contacted ICLE and asked whether he could satisfy the skills and methods course requirement through equivalent courses offered in New York or through home study materials. ICLE informed him that he must physically attend the courses in New Jersey. Tolchin has not attended the courses, nor does he maintain an office in New Jersey. As a consequence, Tolchin has not satisfied the conditions necessary to practice law in New Jersey, even though he has been sworn in to the New Jersey bar.
 
 
 28
 Tolchin filed suit on October 12, 1994, pursuant to 42 U.S.C. §§ 1983 and 1985. The suit raises a myriad of constitutional challenges to the bona fide office and the mandatory attendance requirements. Specifically, Tolchin argues that the bona fide office and the mandatory attendance requirements violate the Commerce Clause, the Privileges and Immunities Clause of Article IV, section 2, and the Equal Protection Clause of the Fourteenth Amendment to the Constitution. He also argues that the implementation and teaching of the skills and methods course violate the Due Process Clause of the Fourteenth Amendment to the Constitution.[1] Tolchin named as defendants (1) the Supreme Court of New Jersey; (2) Chief Justice Robert N. Wilentz;[2] (3) the Clerk of the Supreme Court of New Jersey, Stephen W. Townsend; (4) the New Jersey Board of Bar Examiners; (5) the Board's Secretary, Samuel J. Uberman; (6) ICLE; and (7) Skills and Methods Course Director Joseph J. Hogya (collectively the "Appellees").
 
 
 29
 The Appellees filed a motion for summary judgment. The district court referred the case to a magistrate judge. The magistrate judge filed a Report and Recommendation which recommended that summary judgment be granted. The district court adopted the report and recommendation and entered summary judgment in favor of the Appellees. Tolchin then filed this appeal.
 
 
 30
 The district court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291.
 
 
 31
 As this is an appeal from the district court's Order granting summary judgment to Appellees, we conduct a de novo review. Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir.1995). We must apply the same test used by the district court; namely, whether there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Hersh v. Allen Products Co., 789 F.2d 230, 232 (3d Cir.1986).
 
 
 32
 In determining whether to grant a motion for summary judgment, we must draw all reasonable inferences in favor of Tolchin, as the non-moving party. Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n. 2 (3d Cir. 1983).
 
 III.
 A.
 Tolchin's Commerce Clause Challenge
 
 33
 Tolchin argues that the district court erroneously dismissed his Commerce Clause challenge to the bona fide office and the mandatory attendance requirements. He states that "the Appellants have implemented regulations that unconstitutionally impair interstate commerce without sufficient justification and have thus violated the 'dormant' facet of the Commerce Clause." Tolchin Br. at 16.
 
 1.
 
 34
 The United States Constitution provides that "Congress shall have Power ... to regulate Commerce ... among the several States." U.S. Const. art. I, § 8. While the Commerce Clause explicitly speaks only to the power of Congress to regulate interstate commerce, it has been interpreted to contain "an implied limitation on the power of the States to interfere with or impose burdens on interstate commerce." Western & Southern Life Ins. Co. v. State Bd. of Equalization of California, 451 U.S. 648, 652, 101 S.Ct. 2070, 2074-75, 68 L.Ed.2d 514 (1981). This implied limitation is sometimes referred to as the 'negative' or 'dormant' Commerce Clause, and it is this aspect of Commerce Clause jurisprudence that is at issue in this case.
 
 
 35
 The dormant aspect of the Commerce Clause "prohibits economic protectionism--that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." New Energy Co. of Indiana v. Limbach, 486 U.S. 269, 273, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988). State legislative enactments, executive regulations and judiciary approved rules can all be subject to Commerce Clause analysis. See, e.g., New Energy Co., 486 U.S. 269, 108 S.Ct. 1803, 100 L.Ed.2d 302 (statute); Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) (executive order); Goldfarb v. Virginia State Bar, 421 U.S. 773, 792, 95 S.Ct. 2004, 2015-16, 44 L.Ed.2d 572 (1975) (judiciary-approved rule).
 
 
 36
 When conducting a dormant Commerce Clause analysis, we seek to balance the national interest in vibrant interstate commerce with the local interests promoted by the state regulation. In Pike, the Supreme Court stated that
 
 
 37
 Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree.
 
 
 38
 397 U.S. at 142, 90 S.Ct. at 847 (citation omitted) (emphasis added).
 
 
 39
 In Brown-Forman Distillers Corp. v. New York Liquor Auth., 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986), the Supreme Court later refined its Commerce Clause analysis by holding that when a state statute "directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests," it may generally be struck down without further inquiry. 476 U.S. at 578-79, 106 S.Ct. at 2083-84; see also Instructional Sys., Inc. v. Computer Curriculum Corp., 35 F.3d 813, 824 (3d Cir.1994). On the other hand, when a statute only indirectly affects interstate commerce and regulates evenhandedly, a determination must be made as to whether the State's interest is "legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." Brown-Forman, 476 U.S. at 579, 106 S.Ct. at 2084 (citing Pike, 397 U.S. at 142, 90 S.Ct. at 847). In both cases, however, "the critical consideration is the overall effect of the statute on both local and interstate activity." Id.
 
 
 40
 In this case, the district court, adopting in full the Magistrate's Report and Recommendation, applied the second--the "balancing rule"--standard, which it formulated as follows:
 
 
 41
 if legislation is facially neutral, and only has an incidental effect on commerce, the legislation will be upheld unless the burden on commerce is "clearly excessive in relation to the putative local benefits."
 
 
 42
 Report and Recommendation of Magistrate Judge at 21 ("Magistrate Report") (emphasis added) (quoting Pike, 397 U.S. at 142, 90 S.Ct. at 847) (adopted by district court in Tolchin v. Supreme Court of the State of New Jersey, No. 94-4860 (D.N.J. Dec. 14, 1995)).
 
 
 43
 Although we agree with the district court's selection of the balancing rule test and its result, we disagree with its articulation of the test. For the balancing rule test to apply, a state's action must not be merely 'facially neutral,' but must also be neutral in effect. Brown-Forman makes clear that heightened scrutiny applies not only when legislation is facially discriminatory, but also when a state statute or regulation's "effect is to favor in-state economic interests over out-of-state interests...." 476 U.S. at 579, 106 S.Ct. at 2084.
 
 2.
 
 44
 Tolchin argues that the bona fide office and mandatory attendance requirements favor in-state economic interests and amount to "economic protectionism" that must be subject to the Commerce Clause's heightened scrutiny standard of review. Just as a law forbidding sleeping under a bridge falls more heavily on the shoulders of the indigent than on those of the wealthy, Tolchin argues, these requirements fall more heavily on the shoulders of nonresidents than on those of residents.
 
 
 45
 This analogy sheds little light on the issue before us. Most laws and regulations affect different people differently, depending on their circumstances. The relevant question here is whether there is any differential treatment of nonresident attorneys that "favors in-state interests over out-of-state interests" and "the critical consideration is the overall effect of the statute on both local and interstate activity." Id.
 
 
 46
 All parties agree that, on its face, New Jersey's bona fide office requirement does not discriminate against out-of-state attorneys. See N.J.Ct.R. 1:21-1(a) (1996). However, Tolchin maintains that the bona fide office requirement effectively favors resident attorneys. We disagree. All attorneys who wish to practice in New Jersey must have a bona fide office. As one commentator has observed, the requirement's intent was to prevent occasional practice in New Jersey by an attorney once admitted, but who now practices primarily in another state. Pressler, Current New Jersey Court Rules, Comment R. 1:21-1 (1996). Such an attorney could lose his or her familiarity with New Jersey law and its development. Id. Thus, it is reasonable to assume that the only attorneys actually burdened by this requirement are those who wish to maintain small or sporadic practices in New Jersey. Tolchin argues that although such attorneys are required to spend the money necessary to maintain a bona fide office, they will not receive the comparable benefits that most attorneys with larger New Jersey practices would enjoy. While Tolchin might be right, his argument fails to implicate the Commerce Clause because such attorneys may be New Jersey residents as well as nonresidents.
 
 
 47
 Tolchin has also argued that it is less expensive for New Jersey residents to have a bona fide office because they can maintain them in their homes. Yet, a bona fide office is more than a mere address--it is a functioning office. Tolchin has not shown that more than a few attorneys practice from their homes, so that any advantage which inures to resident attorneys in this regard is minimal. All attorneys must incur some expense in order to comply with this requirement. Any incidental discrimination caused by the bona fide office requirement is not based on residency status, but on the size and type of an attorney's practice.
 
 
 48
 We reach the same conclusion with respect to New Jersey's mandatory attendance requirement, which does not discriminate on its face nor in effect against out-of-state interests any more than the bona fide office requirement. It, too, applies equally on its face to residents and nonresidents and does not effectively favor resident attorneys. Rather, any burden it imposes is directly proportional to the distance an attorney must travel to a skills and methods course site. Tolchin implicitly acknowledges that he is no more personally burdened by this requirement than many New Jersey attorneys, as he repeatedly notes how close New York is to New Jersey. While it is true that the mandatory attendance requirement may present difficulties for those residing hundreds or thousands of miles from New Jersey, we believe it is safe to assume that few attorneys live that far from where they intend to practice. See Frazier v. Heebe, 482 U.S. 641, 648-49, 107 S.Ct. 2607, 2612-13, 96 L.Ed.2d 557 (1987) ("As a practical matter, a high percentage of nonresident attorneys willing to take the state bar examination and pay the annual dues will reside in places 'reasonably convenient' to the" court.); Supreme Court of New Hampshire v. Piper, 470 U.S. 274, 286-87, 105 S.Ct. 1272, 1279-80, 84 L.Ed.2d 205 (1985) ("One may assume that a high percentage of nonresident lawyers willing to take the state bar examination and pay the annual dues will reside in places reasonably convenient to New Hampshire."). We do not believe that the mandatory attendance requirement was purposefully intended to discriminate against the putative class of attorneys who intend to practice a great distance from New Jersey. It is safe to assume that most of the attorneys affected by this regulation are residents of New Jersey, New York and Pennsylvania.
 
 
 49
 We conclude that neither the bona fide office nor the mandatory attendance requirement purposefully or arbitrarily discriminate against out-of-state interests.
 
 3.
 
 50
 Because the bona fide office and the mandatory attendance requirements do not directly regulate or discriminate against interstate commerce, the heightened scrutiny test is not applicable. See Instructional Sys., Inc. v. Computer Curriculum Corp., 35 F.3d 813, 824 (3d Cir.1994). Thus, this case is distinguishable from the Commerce Clause cases that have applied heightened scrutiny to waste flow control ordinances. The Supreme Court has found that flow control ordinances have the effect of depriving "competitors, including out-of-state firms, of access to a local market...." C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 386, 114 S.Ct. 1677, 1679, 128 L.Ed.2d 399 (1994); see also Atlantic Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atlantic County, 48 F.3d 701 (3d Cir.1995). Because we have found no such deprivation, those cases do not mandate that we apply heightened scrutiny here. Accordingly, the district court was correct in applying the balancing rule test. Under this test, we must compare the local benefits of a regulation with the incidental burdens that it imposes on interstate commerce in order to determine whether the burdens are clearly excessive. Instructional Sys., 35 F.3d at 824.
 
 
 51
 Appellee New Jersey Supreme Court argues that the bona fide office requirement has the benefits of assuring the competence, accountability and accessibility of attorneys for the benefit of clients, courts, counsel and parties. Tolchin responds that there is no rational relationship between these benefits and the bona fide office requirement. While we agree with Tolchin's analysis in part, we nonetheless find that a rational relationship exists between the benefit of attorney accessibility and the bona fide office requirement.
 
 
 52
 In a case where in-state offices were required only of nonresidents, the United States Supreme Court held that there is no rational relationship between such a requirement and attorney competence. Frazier v. Heebe, 482 U.S. 641, 649, 107 S.Ct. 2607, 2613, 96 L.Ed.2d 557 (1987) ("the mere fact that an attorney has an office in [a jurisdiction] surely does not warrant the assumption that he or she is more competent than an out-of-state member of the state bar."); see also Barnard v. Thorstenn, 489 U.S. 546, 555, 109 S.Ct. 1294, 1300-01, 103 L.Ed.2d 559 (1989) ("We can assume that a lawyer who anticipates sufficient practice in [a jurisdiction] to justify taking the bar examination and paying the annual dues ... will inform himself of the laws of the [jurisdiction]."); Supreme Court of New Hampshire v. Piper, 470 U.S. 274, 285, 105 S.Ct. 1272, 1279, 84 L.Ed.2d 205 (1985) (Court will not assume that "a nonresident lawyer--any more than a resident--would disserve his clients by failing to familiarize himself with the [local law]."). We believe that this holds true here as well. The Appellees have put forth no credible arguments as to why the bona fide office requirement would make an attorney more competent.
 
 
 53
 Nor do we find that New Jersey's bona fide office requirement increases attorney accountability. New Jersey requires that all nonresident attorneys designate the Clerk of the New Jersey Supreme Court as agent for receipt of service of process. N.J.Ct.R. 1:21-1(a) (1996). The New Jersey Supreme Court can therefore discipline all members of the New Jersey bar, regardless of residency. The Appellees make no compelling argument as to how New Jersey's bona fide office requirement is rationally related to attorney accountability.
 
 
 54
 However, we do believe that the bona fide office requirement has a rational relationship to the benefit of attorney accessibility for clients, courts, counsel and parties, and our belief is borne out by a New Jersey case which highlights the problems caused by attorneys who fail to maintain bona fide offices in New Jersey. In In The Matter of Kasson, 141 N.J. 83, 660 A.2d 1187 (1995), the New Jersey Supreme Court upheld the disciplining of an attorney pursuant to Rule 1:21-1(a) because the trial court had serious difficulty locating him during the course of litigation. Kasson's New Jersey office was never used, his name was misspelled on a sign and the office number on his letterhead was not the same as the number on the sign, which was not the same as the number of the actual office. Id. at 1188; see also Opinion 19, 138 N.J.L.J. 320 (disciplining a bar member for renting, but not using, office in New Jersey). In our view, this case demonstrates that there is a satisfactory basis to find a rational relationship between the bona fide office requirement and the intended benefit of attorney accessibility.[3]
 
 
 55
 Thus, while the bona fide office requirement does impose the burden of maintaining an office on some attorneys who would prefer not to maintain one, we believe that those most burdened do not constitute a very large class. This class may include those who practice solely, but sporadically, in New Jersey; those who occasionally practice in New Jersey as part of a larger practice based in another state; and those who prefer to practice without maintaining any office at all. The requirement's burden affects interstate commerce in that it limits the mobility of some lawyers and reduces the options for consumers of the services they provide.
 
 
 56
 However, under the balancing test, we find that the burden on interstate commerce does not clearly outweigh the benefit received from the bona fide office requirement. See Instructional Sys., 35 F.3d at 824. This is not to say that such a requirement is the most narrowly tailored solution to the problem of attorney accessibility. We merely hold that such a requirement is rationally related to the benefit it is supposed to ensure.[4]
 
 
 57
 Likewise, we believe that the mandatory attendance requirement for the skills and methods course is rationally related to the benefits it is intended to promote. The skills and methods classes are intended to train attorneys new to the New Jersey bar and to protect the public from untrained attorneys. Mandatory attendance at the course serves a defensible educational purpose: it ensures that attorneys hear--if not listen to--those topics thought to be important by the Appellees.
 
 
 58
 In support of his argument to the contrary, Tolchin submitted an affidavit from Dean Frank Macchiarola of the Cardozo Law School which, Tolchin argues, indicated that mandatory attendance served no valid educational function. However, the Macchiarola affidavit does not make such sweeping claims. It is limited to disputing some of the reasons proffered by Hogya for the mandatory attendance requirement; to asserting that mandatory attendance has no advantage over other approaches; and to extolling the advantages of customized learning. As a result, this affidavit fails to raise a genuine issue of material fact as to whether the mandatory attendance requirement is rationally connected to its intended benefits.
 
 
 59
 Moreover, the burdens on interstate commerce imposed by the mandatory attendance requirement for the skills and methods course are relatively small when compared to the benefits it promotes. The first year component of the course requires an attorney to invest a total of 40 hours. For that investment, New Jersey can be confident that attorneys new to its bar are at least minimally familiar with its laws. This requirement is even a small burden for those attorneys who want to practice in more than one state. Finally, the commuting burden for Tolchin, who is a bridge or two away from New Jersey, is actually less than it is for many New Jersey residents. See id.
 
 
 60
 Because this requirement appears to be a substantial burden only for the relatively few nonresident attorneys who reside a great distance from New Jersey, we do not find that such a burden clearly outweighs the benefits promoted by this requirement. Nor has Tolchin demonstrated that this widely accepted educational policy is in some way so wrong that we must declare it irrational.[5]
 
 
 61
 Even if the New Jersey rules were to have an element of "economic protectionism," we do not find that the requirements at issue in this case are so protectionist as to fail in the context of a dormant Commerce Clause analysis. Thus, we conclude that the district court properly relied upon the Pike balancing test, and concur with its result. New Jersey's bona fide office and mandatory attendance requirements generally burden nonresident attorneys to the same degree that they burden resident attorneys. The fact that these requirements may burden commerce in some incidental way is not enough to support Tolchin's claim.
 
 
 62
 Moreover, states clearly have a substantial interest in assuring the availability of and overseeing attorneys practicing within their borders. See Leis v. Flynt, 439 U.S. 438, 444 n. 5, 99 S.Ct. 698, 701 n. 5, 58 L.Ed.2d 717 (1978) (recognizing "the traditional authority of state courts to control who may be admitted to practice" before them); Goldfarb v. Virginia State Bar, 421 U.S. 773, 792, 95 S.Ct. 2004, 2015-16, 44 L.Ed.2d 572 (1975) (recognizing state courts have "broad power to establish standards for licensing practitioners and regulating the practice of professionals"). And finally, where heightened scrutiny is not warranted, we must not "second guess the empirical judgment of lawmakers concerning the utility of legislation." CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 92, 107 S.Ct. 1637, 1651, 95 L.Ed.2d 67 (1987) (quoting Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 679, 101 S.Ct. 1309, 1320-21, 67 L.Ed.2d 580 (1981) (Brennan, J., concurring)).
 
 
 63
 Tolchin argues that, at the very least, summary judgment should be denied so as to allow further investigation of the burdens of these requirements. We find that further investigation is unnecessary because, as the Fourth Circuit noted in a similar context, to require hearings in such cases
 
 
 64
 would deal a serious blow to the capacities of the states and localities to further even the most basic regulatory purposes. As the Commerce Clause is implicated by almost every economic regulation ... and its shadow extends equally far ... such hearings would be an almost constant process.
 
 
 65
 Goldfarb v. Supreme Court of Virginia, 766 F.2d 859, 862 (4th Cir.1985). We agree.
 
 B.
 
 66
 Tolchin's Privileges and Immunities Challenge
 
 
 67
 Tolchin further claims that the bona fide office and mandatory attendance requirements violate the Privileges and Immunities Clause.
 
 
 68
 The Privileges and Immunities Clause provides that "Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2. This clause was intended to "fuse into one Nation a collection of independent, sovereign States." Supreme Court of New Hampshire v. Piper, 470 U.S. 274, 279, 105 S.Ct. 1272, 1275-76, 84 L.Ed.2d 205 (1985) (quoting Toomer v. Witsell, 334 U.S. 385, 395, 68 S.Ct. 1156, 1161-62, 92 L.Ed. 1460 (1948)). Under this clause, the terms "citizen" and "resident" are used interchangeably. Piper, 470 U.S. at 279 n. 6, 105 S.Ct. at 1276 n. 6.
 
 
 69
 The Privileges and Immunities Clause applies only "with respect to those 'privileges' and 'immunities' bearing on the vitality of the Nation as a single entity." Id. at 279, 105 S.Ct. at 1275-76 (quoting Baldwin v. Montana Fish & Game Comm'n, 436 U.S. 371, 383, 98 S.Ct. 1852, 1860, 56 L.Ed.2d 354 (1978)). The United States Supreme Court has found that "one of the privileges which the Clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State." Piper, 470 U.S. at 280, 105 S.Ct. at 1276 (quoting Toomer v. Witsell, 334 U.S. 385, 396, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460 (1948)). The Supreme Court has recognized the practice of law as a privilege under the Privileges and Immunities Clause, "and that a nonresident who passes a state bar examination and otherwise qualifies for practice has an interest protected by the Clause." Barnard v. Thorstenn, 489 U.S. 546, 553, 109 S.Ct. 1294, 1299, 103 L.Ed.2d 559 (1989); see also Supreme Court of Virginia v. Friedman, 487 U.S. 59, 65, 108 S.Ct. 2260, 2264-65, 101 L.Ed.2d 56 (1988); Piper, 470 U.S. at 279-83, 105 S.Ct. at 1275-78. The practice of law is protected by the Privileges and Immunities Clause because it plays a vital role in the nation's economy and facilitates the vindication of individual and societal rights. Piper, 470 U.S. at 280-81, 105 S.Ct. at 1276-78.
 
 
 70
 If a state statute or regulation imposes identical requirements on residents and nonresidents alike and it has no discriminatory effect on nonresidents, it does not violate the Privileges and Immunities Clause. Lutz v. City of York, Pennsylvania, 899 F.2d 255, 263 (3d Cir.1990). But when a challenged restriction deprives nonresidents of a privilege or immunity protected by this clause, it is invalid unless "(i) there is a substantial reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State's objective." Piper, 470 U.S. at 284, 105 S.Ct. at 1278. In addressing these questions, we consider, among other things, whether less restrictive means of regulation are available. Barnard, 489 U.S. at 552-53, 109 S.Ct. at 1299-1300. Of course, we must distinguish between incidental discrimination against nonresidents and discrimination that imposes too heavy a burden on their privileges. See id. at 557, 109 S.Ct. at 1301-02.
 
 
 71
 Over the last ten years, the United States Supreme Court has considered whether a number of bar admission requirements violate the Privileges and Immunities Clause. In 1985, the Court struck down a New Hampshire residency requirement, which limited state bar admission to New Hampshire residents, as a violation of the Privileges and Immunities Clause. Piper, 470 U.S. at 288, 105 S.Ct. at 1280-81. The Court determined that the residency requirement deprived nonresidents of a protected privilege. Id. at 284, 105 S.Ct. at 1278.
 
 
 72
 New Hampshire defended its rule, contending that nonresident bar members would be less likely to stay current with local rules and procedures, to behave ethically, to do pro bono work in the state and to be accessible to clients and the court. Id. at 285, 105 S.Ct. at 1279. The Court disagreed with each of these contentions, stating that a nonresident attorney's interest in his or her reputation would provide the same incentive to maintain high standards as would that of a resident attorney. Id. at 286, 105 S.Ct. at 1279-80. The Court found that New Hampshire had not shown a "substantial reason" for discriminating against nonresident bar applicants and had not demonstrated that the discrimination bore a close relationship to its objectives. Id. at 287, 105 S.Ct. at 1280. The Court concluded that less restrictive alternatives--including mandatory attendance at seminars on state practice--would support the State's interest in ensuring that admitted attorneys were familiar with local rules and procedure. Id. at 284-87, 105 S.Ct. at 1278-80.
 
 
 73
 Similarly, in Friedman, the Supreme Court struck down a Virginia rule that permitted admission to the Virginia bar simply on motion for attorneys who had become permanent residents of Virginia and were licensed in another state. Friedman, 487 U.S. at 61, 108 S.Ct. at 2262. Nonresidents of Virginia admitted to practice in another state, however, were required to take the Virginia bar exam. The Supreme Court determined that Virginia's discretionary admissions policy violated the Privileges and Immunities Clause by denying nonresident attorneys the opportunity to practice law in Virginia on terms substantially equal to those of resident attorneys. Id. at 70, 108 S.Ct. at 2267. In so holding, the Court specifically noted that Virginia's requirement that attorneys maintain in-state offices furnished a less restrictive alternative to protect its regulatory interests. Id.
 
 
 74
 More recently, in Barnard v. Thorstenn, 489 U.S. 546, 109 S.Ct. 1294, 103 L.Ed.2d 559 (1989), the Supreme Court struck down a residency requirement incorporated into a District Court of the Virgin Islands Rule. This rule provided that before an otherwise qualified attorney could be admitted, that attorney must establish that he or she resides and intends to continue residing in the Virgin Islands. Id. at 559, 109 S.Ct. at 1303. The Supreme Court held that this residency requirement violated the Privileges and Immunities Clause by excluding nonresidents from the Virgin Islands bar. Id. Moreover, the Court determined that the residency requirement did not bear a substantial relation to the District Court of the Virgin Islands' objectives, which included ensuring the availability of nonresident attorneys and maintaining an adequate level of competence in the local laws, which were infrequently published. Id. at 558-59, 109 S.Ct. at 1302-03.
 
 
 75
 The Court found that less restrictive means existed to address these concerns. Nonresidents could associate with local counsel, relieving the State of any burden associated with accommodating nonresidents' travel schedules. Id. at 555, 109 S.Ct. at 1300-01. The Court also found that if the Virgin Islands failed to publish legal materials in a timely manner, the problem of attorneys staying current with local law would be just as severe for residents as nonresidents. Id. at 556, 109 S.Ct. at 1301.
 
 
 76
 Since 1985, then, the United States Supreme Court has struck down restrictions on state bar admission requirements, and has indicated that a state must treat residents and nonresidents equally when it considers an individual's admission to the bar. As a result of these decisions, all states have eliminated residency-based bar admission requirements.[6][6] A state's interest in regulating the practice of law is similar to its interest in regulating admission to the bar, and the Supreme Court cases in this area offer us guidance in our analysis.
 
 
 77
 Our Privileges and Immunities analysis has two steps. First, do the bona fide office and mandatory attendance requirements discriminate against nonresident attorneys? Second, if they do, is the imposition too heavy a burden on the privileges of nonresidents, and does it fail to bear a substantial relationship to New Jersey's objective? See id. at 557, 109 S.Ct. at 1301-02.
 
 
 78
 As noted in Section III.A., above, both requirements similarly affect residents and nonresidents. Resident and nonresident attorneys alike must maintain a New Jersey office. Moreover, as the district court noted, the bona fide office requirement provides New Jersey with a reasonable avenue through which it can protect its interest of ensuring that attorneys licensed in New Jersey are available to New Jersey courts, practitioners and clients. See Friedman, 487 U.S. at 69-70, 108 S.Ct. at 2266-67 (recognizing that an in-state office requirement was an appropriate and less restrictive means of enforcing Virginia's full time practice restriction).
 
 
 79
 Similarly, the mandatory attendance requirement applies equally to residents and nonresidents. Tolchin argues that the mandatory attendance policy is discriminatory because it unduly burdens nonresident attorneys who may not be able to find time to attend the skills and methods class. However, as we have already noted, a New Jersey resident may need to travel farther and longer than someone in New York City to get to a course site. In other words, the discrimination here is based on the inconvenience of course sites and not on residence status. Nonresidents who wish to practice law in New Jersey are required to make the effort to attend continuing education courses. This is a rational requirement, given the need to educate attorneys new to the New Jersey bar and given traditional educational approaches.[7]
 
 
 80
 We conclude that the bona fide office and mandatory attendance requirements do not impose a disproportionately heavy burden on nonresidents. These requirements bear a substantial relationship to New Jersey's goal of regulating the practice of law to the benefit of the public and are not overly restrictive of attorneys. Thus, these requirements do not violate the Privileges and Immunities Clause. See Barnard, 489 U.S. at 557, 109 S.Ct. at 1301-02.
 
 C.
 
 81
 Tolchin's Equal Protection Clause Challenge
 
 
 82
 The Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The threshold question is what standard governs the equal protection analysis in this case.
 
 
 83
 Tolchin argues that the right to practice law in New Jersey is a fundamental right for equal protection purposes. Thus, Tolchin claims, the district court erred in granting summary judgment to the Appellees on his equal protection challenge because it did not apply the strict scrutiny standard of review to the bona fide office and the mandatory attendance requirements. In the alternative he argues that these requirements would not even survive rational basis review.
 
 
 84
 We have found that as a general matter, "economic and social legislation is subject to rational basis review, under which a law need only be 'rationally related to a legitimate state interest.' " Schumacher v. Nix, 965 F.2d 1262, 1266 (3d Cir.1992) (quoting City of New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516-17, 49 L.Ed.2d 511 (1976) (per curiam)). However, where legislation establishes a classification that implicates fundamental rights or draws upon suspect distinctions such as race, religion or alienage, the legislation must meet strict scrutiny analysis. Schumacher, 965 F.2d at 1266. While we are not reviewing legislation in the traditional sense, judiciary-approved rules fall within the ambit of the Equal Protection Clause. Id. at 1266 n. 6.
 
 
 85
 The Supreme Court has indicated that the right to practice law is not a fundamental right for the purposes of the Fourteenth Amendment. See Leis v. Flynt, 439 U.S. 438, 442 n. 5, 99 S.Ct. 698, 701-02 n. 5, 58 L.Ed.2d 717 (1979) ("[T]he suggestion that the Constitution assures the right of a lawyer to practice in the court of every State is a novel one, not supported by any authority brought to our attention."); Schware v. Board of Bar Examiners, 353 U.S. 232, 238-39, 77 S.Ct. 752, 755-56, 1 L.Ed.2d 796 (1957) ("[A] State can require high standards of qualification ... before it admits an applicant to the bar, but any qualification must have a rational connection with the applicant's fitness or capacity to practice law."). Moreover, we have flatly rejected the argument that the practice of law is a fundamental right protected by the Equal Protection Clause. Edelstein v. Wilentz, 812 F.2d 128, 132 (3d Cir.1987); In the Matter of Roberts, 682 F.2d 105, 108 (3d Cir.1982).
 
 
 86
 Tolchin claims that Supreme Court of New Hampshire v. Piper, 470 U.S. 274, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985), supports his position. In Piper, the Court determined that "the opportunity to practice law should be considered a 'fundamental right' " which "falls within the ambit of the Privileges and Immunities Clause." Id. at 281, 105 S.Ct. at 1276-77. Tolchin attempts to bootstrap this use of the term "fundamental right" into equal protection jurisprudence. However, "fundamental" privileges and immunities are not interchangeable with the rights deemed "fundamental" for equal protection purposes. See Friedman v. Supreme Court of Virginia, 822 F.2d 423, 426 (4th Cir.1987), aff'd, 487 U.S. 59, 108 S.Ct. 2260, 101 L.Ed.2d 56 (1988) (recognizing that "the Privileges and Immunities Clause protects more [rights] than those rights which are considered fundamental individual rights protected by the Fourteenth Amendment").
 
 
 87
 The bona fide office and mandatory attendance requirements apply to all attorneys who want to practice in New Jersey. They do not create a suspect classification based on race, religion or alienage. Accordingly, there is simply no basis upon which Tolchin can credibly argue that strict scrutiny is the appropriate standard of review. See Schumacher, 965 F.2d at 1266. We conclude that Tolchin's claim that the bona fide office and mandatory attendance requirements deny him the right to practice law is subject to a rational basis review.
 
 
 88
 Tolchin argues that even if heightened scrutiny is unwarranted, the bona fide office and the mandatory attendance requirements fail to survive rational basis review. He claims that these requirements are not rationally related to New Jersey's interest in regulating the practice of law.
 
 
 89
 To demonstrate the alleged irrationality of the requirements, Tolchin suggests a number of alternatives, less burdensome to him, that the New Jersey Supreme Court could implement to achieve its objectives. We need not consider these alternatives. For the purposes of rational basis review, we have held that a rule need not be the least restrictive means of achieving a permissible end. Id. So long as the New Jersey Supreme Court "could rationally have decided" that its action would further its goal, "the Equal Protection Clause is satisfied." Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659 (1981); see also Parham v. Hughes, 441 U.S. 347, 351, 99 S.Ct. 1742, 1745-46, 60 L.Ed.2d 269 (1979) ("Under a rational basis test, a law is entitled to a presumption of validity.").
 
 
 90
 Both the bona fide office and mandatory attendance requirements are rationally related to New Jersey's interest in regulating the practice of law. We have already concluded that the bona fide office requirement is rationally related to New Jersey's interest in ensuring that attorneys admitted to practice law in New Jersey are available to New Jersey courts. See Section III.A., above. The fact that Tolchin and others similarly situated may be burdened by this requirement is not enough to deem the requirement invalid under the rational relation test. See Schumacher, 965 F.2d at 1266. The skills and methods course was developed to assist attorneys in their transition to practice in New Jersey from law school or practice in another state. The mandatory attendance requirement, by ensuring that attorneys be, at a minimum, present at the Continuing Legal Education classes, will tend to ensure that attorneys absorb the lessons of the course. While Tolchin may be correct in maintaining that he could just as easily learn the material from the comfort of his own home, rational basis review does not allow us to conclude that New Jersey was constitutionally required to accommodate him. See Clover Leaf Creamery Co., 449 U.S. at 466, 101 S.Ct. at 725.
 
 
 91
 In summary, the right to practice law is not a fundamental right for the purposes of the Equal Protection Clause. Thus, Tolchin's claim fails because the bona fide office and mandatory attendance requirements are rationally related to New Jersey's legitimate interests in regulating the practice of law within its borders.
 
 D.
 Tolchin's Due Process Challenge
 
 92
 Rule 1:26 provides that the skills and methods "course format shall be set forth in the rules of the Board of Bar Examiners." N.J.Ct.R. 1:26. The Board has not promulgated any rules regarding the skills and methods course. Tolchin argues that the implementation of the skills and methods course violates the Due Process Clause of the Fourteenth Amendment to the Constitution because the New Jersey Board of Bar Examiners failed to adopt the rules governing the format and curriculum of the course through formal rulemaking procedures, thereby depriving him of his right to earn his livelihood by practicing in New Jersey.
 
 
 93
 The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty or property without due process of law."[8] U.S. Const. amend. XIV. To satisfy the requirements of the Due Process Clause, laws and regulations must provide specific standards which avoid arbitrary and discriminatory enforcement. Grayned v. Rockford, 408 U.S. 104, 109, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972). An agency's failure to follow its rules and regulations, however, is not a per se violation of due process. See United States v. Caceres, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). Rather, the Due Process Clause is implicated only when an agency violates regulations mandated by the Constitution or by law; or when "an individual has reasonably relied on agency regulations promulgated for his guidance or benefit and has suffered substantially because of their violation by the agency." Id. at 752-53, 99 S.Ct. at 1472. Due process may also be violated if the government acts arbitrarily or capriciously. Grayned, 408 U.S. at 109, 92 S.Ct. at 2299.
 
 
 94
 Rule 1:26 is not mandated by the Constitution or by law. Rather, it is a rule promulgated by the New Jersey Supreme Court for the oversight of the New Jersey bar. Furthermore, Tolchin has not made any showing that he has reasonably relied on Rule 1:26 to his detriment.
 
 
 95
 Rather, the record indicates that Tolchin was aware of what was required to practice in New Jersey. The New Jersey Supreme Court has approved specific standards which guide the administration of the skills and methods course. See Magistrate Report at 14-16. That court specifically directed ICLE to implement a mandatory attendance policy. This directive was only implemented after public notice of the proposal. The record indicates that the Appellees have in all ways -- except for promulgating the Board of Law Examiners Rules -- acted with forethought and consistency in regard to the skills and methods course. Thus, Tolchin has suffered no violation of due process. See Grayned, 408 U.S. at 109, 92 S.Ct. at 2299.
 
 
 96
 Tolchin has not been excluded from the practice of law. To the contrary, he has unilaterally decided that the mandatory attendance requirement is too burdensome for him. As a result, he is unable to satisfy New Jersey's skills and methods course requirement, rendering him ineligible to practice there. Clearly, then, Tolchin's inability to practice law is due to his own actions and not to any constitutional due process violation.
 
 IV.
 
 97
 In conclusion, Tolchin has not raised as issue of fact sufficient to preclude the entry of summary judgment in favor of the Appellees. See Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986).
 
 
 98
 While it may be true, as Tolchin argues, that the bona fide office requirement may include element of economic protectionism, such is not fatal to a state statute or regulation. See Piper, 470 U.S. 274, 285 n. 18, 105 S.Ct. 1272, 1279 n. 18, 84 L.Ed.2d 205 (1985).
 
 
 99
 Tolchin may also be right in noting the peculiarities present in this case: these rules were promulgated by members of the New Jersey bar to regulate members of the New Jersey bar. To be sure, there are few checks and balances -- aside from seeking redress in the federal courts -- to ensure that such rules are not designed primarily for the benefit of the New Jersey bar. However, we are satisfied that the requirements at issue in this case withstand Tolchin's challenge. We continue to believe that states should have latitude "in regulating the practicing of law and admission to the bar." Schumacher v. Nix, 965 F.2d 1262, 1269 (3d Cir.1992).
 
 
 100
 We recognize that one could argue that some of the recent rapid advances in communication and transportation technology may render the bona fide office requirement's intended benefit of attorney accessibility less significant in the future. See Piper, 470 U.S. at 287 n. 21, 105 S.Ct. at 1280 n. 21 ("Conference calls are being used increasingly as an expeditious means of dispatching pretrial matters."); Frazier, 482 U.S. at 649, 107 S.Ct. at 2613 ("[M]odern communication systems, including conference telephone arrangements, make it possible to minimize the problem of unavailability."). Notwithstanding this concern, and for the reasons mentioned above, we will affirm the district court's grant of summary judgment to the defendants.
 
 
 
 [1]
 Tolchin also argues that ICLE's application for summary judgment under the Eleventh Amendment should be denied; the individual defendants are proper parties; and summary judgment should be granted in his favor. Because of our disposition of the merits, we need not consider these issues
 
 
 [2]
 Chief Justice Wilentz resigned on July 1, 1996. He has been succeeded as Chief Justice by Deborah T. Poritz
 
 
 [3]
 Chief Judge Sloviter agrees that the bonafide office requirement has a rational relationship to the benefit of attorney accessibility for clients, courts, counsel and parties. Inasmuch as the challenged rule can be sustained on that basis, she does not join the portion of this opinion that rejects the New Jersey Supreme Court's argument that the bona fide office requirement helps assure the competence and accountability of attorneys
 
 
 [4]
 We also note that the United States Supreme Court, in dicta, has approved just such a requirement. Supreme Court of Virginia v. Friedman, 487 U.S. 59, 69-70, 108 S.Ct. 2260, 2266-67, 101 L.Ed.2d 56 (1988) (Virginia "requires that attorneys admitted on motion maintain an office for the practice of law in Virginia.... The office requirement furnishes an alternative to the residency requirement....")
 
 
 [5]
 We note that the Supreme Court, in dicta, has approved of mandatory attendance requirements for continuing legal education. See Supreme Court of Virginia v. Friedman, 487 U.S. 59, 69, 108 S.Ct. 2260, 2266-67, 101 L.Ed.2d 56 (1988) (court can "require mandatory attendance at periodic Continuing Legal Education courses."); Frazier v. Heebe, 482 U.S. 641, 648, 107 S.Ct. 2607, 2612-13, 96 L.Ed.2d 557 (1987) ("[O]ther more effective means of ensuring the competence of bar members are available ... including examination or seminar attendance requirements."); Supreme Court of New Hampshire v. Piper, 470 U.S. 274, 285 n. 19, 105 S.Ct. 1272, 1279 n. 19, 84 L.Ed.2d 205 (1985) ("A less restrictive alternative would be to require mandatory attendance at periodic seminars on state practice. There already is a rule requiring all new admittees to complete a 'practical skills course' within one year of their admission.")
 
 
 [6]
 See Brian N. Corrigan et al., Admission?, Yes; Practice? No: New York's Inconsistent Treatment of Nonresident Attorneys, 6 St. John's J. Legal Comment. 383, 390 (1991)
 
 
 [7]
 Moreover, as we noted above, the United States Supreme Court has indicated in dicta that such a requirement was consistent with the Privileges and Immunities Clause. Friedman, 487 U.S. at 69, 108 S.Ct. at 2266-67; Piper, 470 U.S. at 285 n.19, 105 S.Ct. at 1279 n. 19; see n.5 above
 
 
 [8]
 Because of the result that we reach in this case, we need not decide the related question of whether one who has passed a state bar exam, but who is for some reason ineligible to practice, has a property interest protected by the Due Process Clause