CLOVERLAND—GREEN SPRING DAIRIES, INC., Plaintiff

and

Thomas E. McGlinchey, et al., Plaintiffs/Intervenors

v.

PENNSYLVANIA MILK MARKETING BOARD, Beverly R. Minor, Individually and as Chairperson of the Board, Luke F. Brubaker and J. Robert Derry, Individually and as Members of the Board, Defendants

No. CIV 1:CV–99–0487.

United States District Court, M.D. Pennsylvania.

Feb. 2, 2001.

---

Scott Thomas Wyland, Kevin J. McKeon, Malatesta, Hawke & McKeon, Harrisburg, PA, Sheldon A. Weiss, Mountainside, NJ, for plaintiff.

Gwendolyn T. Mosley, Office of Atty. Gen., Harrisburg, PA, for defendants.

Allen C. Warshaw, Duane, Morris & Heckscher, Harrisburg, PA, for Pennsylvania, Ass'n of Milk Dealers.

Thomas J. Finucane, Finucane Law Office LLP, Chambersburg, PA, for intervenor-plaintiffs.

## MEMORANDUM

RAMBO, District Judge.

Before the court are three separate motions for summary judgment submitted by Plaintiff, Intervenor Plaintiffs, and Defendants.[1] The parties have briefed the

---

1. In addition to the cross-motions for summary judgment, the following motions are also pending before the court: Defendants' motion to strike the affidavit of Robert G. Havemeyer and portions of the affidavits of Lawrence Webster and Professor Harold Harris, and the Pennsylvania Association of Milk Dealers' motion to intervene as a Defendant

issues, the court has conducted oral argument, and the motions are ripe for disposition.

## I. *Background*

The instant action seeks a declaratory judgment that certain provisions of Pennsylvania's Milk Marketing Law, 31 Pa. Stat. Ann. §§ 700j–101, *et seq.* ("PMML"), and certain provisions of Official General Orders A–890A and A–900, (i) violate the Commerce Clause of the United States Constitution, and (ii) deprive Plaintiff of rights guaranteed pursuant to 42 U.S.C. § 1983. Additionally Plaintiff seeks to enjoin Defendants from enforcing the minimum milk prices fixed pursuant to Orders A–890A and A–900.

### A. *Factual Background*

Unless otherwise indicated, the following facts are undisputed by the parties. Plaintiff, Cloverland–Green Spring Dairies, Inc. ("Cloverland"), is a Maryland corporation that engages in the business of processing and selling milk to various wholesale accounts, primarily stores, within and around Baltimore, Maryland. Plaintiff–Intervenors are Pennsylvania milk consumers residing in Pennsylvania Milk Marketing Area # 4 ("Area # 4"), Sue A. Spigler and Gertrude Giorgini, and in Pennsylvania Milk Marketing Area # 1 ("Area # 1"), Thomas E. McGlinchey (collectively referred to as the "Milk Consumers," or together with Cloverland as "Plaintiffs"). Defendant Pennsylvania Milk Marketing Board (the "Board") is the Pennsylvania state administrative agency charged by state law with the task of promulgating orders designating milk marketing areas within the Commonwealth and fixing minimum wholesale and retail prices to be charged within such milk marketing areas. Defendant Beverly Minor is the present

Chairperson, and Defendants Luke Brubaker and J. Robert Derry are the two other members of the Board. Acting in their official capacities, Defendants promulgated Official General Orders A–890A and A–900, including the minimum wholesale milk prices established thereby.

Southeastern and South Central Pennsylvania comprise part of a much larger interstate milk market which includes, in addition to the five Southeastern and ten South Central Counties of Pennsylvania, Southern New Jersey, Delaware, Maryland, Washington, D.C., and portions of Northern Virginia. The milk industry in that area is characterized by substantial interstate movement of fluid milk, both from the dairy farm to the processing/bottling plant, and from the plant to the retailer and ultimate consumer. Throughout most of the Northeast, including Southeastern and South Central Pennsylvania, the minimum prices that fluid milk processors ("handlers") must pay to dairy farmers ("producers") or associations of dairy farmers ("cooperatives"), are established by "regional" Federal Milk Marketing Orders, promulgated by the United States Secretary of Agriculture ("Secretary"), pursuant to the Agriculture Marketing Agreement Act of 1937 ("AMAA"), 7 U.S.C. § 601, *et seq.*, as amended.

The Secretary has issued and enforced the "Middle Atlantic Marketing Order, Order # 4," which regulates the minimum prices that processing plants pay to producers for raw milk which is processed and packaged for sale to consumers. Among other things, the Secretary has promulgated and enforces provisions that: (a) establish the minimum prices that fluid milk handlers must pay producers for milk which is used for bottling as packaged fluid milk ("Class I" milk) or manufac-

in this action. These motions will also be decided in the present memorandum opinion.

tured into soft or hard dairy products, such as cottage cheese, cream cheese, hard cheese, butter, or powdered milk ("Class II" or "Class III" milk); and (b) establish a mechanism for the "pooling" of all revenue received for raw milk among all producers regulated by the Order. In determining said minimum producer prices, the Secretary is required by law to fix, among other things, such prices as he finds will "ensure a sufficient quantity of pure and wholesome milk to meet current needs and further assure a level of farm income adequate to maintain productive capacity sufficient to meet anticipated future needs, and be in the public interest." 7 U.S.C. § 608c(18).

There has been more than an adequate supply of milk available to consumers throughout Pennsylvania and all of the Middle Atlantic region. Currently, and for the past several years, approximately half, or even less, of producer milk regulated by Federal Order # 4 has been used for fluid purposes. The remainder is used to manufacture Class II and Class III products, which are marketed in competition with the Class II and III milk products from elsewhere in the United States. Much more milk is produced in Pennsylvania than is consumed in Pennsylvania. According to statistics published by the Agriculture Marketing Service of the United States Department of Agriculture, in 1997 and 1998 Pennsylvania dairy farmers in the aggregate produced and marketed approximately 900 pounds of milk per year for each inhabitant of the Commonwealth, whereas per capita fluid milk consumption nationwide was about 200 pounds per year.

Federal Milk Marketing Orders do not in any way establish or fix "resale" prices, that is, prices paid for the finished product, whether sold by the milk processor to nonprocessing milk dealers ("distributors"), or to other "wholesale" customers (e.g., stores, schools, hospitals, and other institutions); or the prices received by processors, distributors, or stores from the ultimate consumers. Throughout virtually all of the United States, those "resale" or wholesale and retail milk prices are determined by competitive market forces, not by state regulation. (Pl.'s Mot. for Sum. Jud.App. A, Webster Aff. ("Webster") ¶ 4; Pl.'s Mot. for Sum. Jud.App. B, Harris Aff. ("Harris") ¶ 9.)

The Commonwealth of Pennsylvania, through the Defendant Board, establishes and enforces "minimum" wholesale and retail milk prices which stores, schools, and consumers must pay for the milk they purchase. The state statute pursuant to which the Board sets said minimum prices is the PMML, Pennsylvania's Milk Marketing Law, 31 Pa. Cons.Stat. Ann. §§ 700j-101, *et seq.* The PMML was first enacted in 1933 during the Great Depression, several years before an effective federal milk marketing program was in place. The PMML mandates the state agency, the Board, to establish "milk marketing areas" within the Commonwealth, and to fix minimum "wholesale and retail" milk prices applicable to every level of transaction.

Pennsylvania is the only state that by law requires that a state agency set mandatory minimum wholesale and retail milk prices. Today, the only other states that impose minimum resale prices are Maine and North Dakota; however unlike Pennsylvania, whether to set mandatory prices in those states is at the discretion of the states' milk control agencies.[2] (Webster ¶ 5; Harris ¶¶ 9, 12, 13.) Throughout the rest of the country, grocery stores, and all

---

**2.** Defendants indicate, without citation, that New York State regulates the retail price of milk with a law that limits the retail price to under two times the producer price.

other wholesale customers acquire their milk pursuant to competitive forces, primarily price competition, unhampered by state-imposed "minimum" prices.

The operative provisions of the PMML with respect to the criteria to be employed by the Board in fixing minimum wholesale and retail prices are contained in PMML § 801. Among other things, that section requires that after a hearing, the Board shall "ascertain and maintain such prices . . . for milk in the respective milk marketing areas as will . . . best protect the milk industry of the Commonwealth and insure a sufficient quantity of pure and wholesome milk to the inhabitants of the Commonwealth . . ." 31 Pa. Stat. Ann. § 700j–801. Plaintiffs assert that Pennsylvania inhabitants would have a "sufficient quantity of pure and wholesome milk" without the fixing of minimum resale prices by the Board. (Harris ¶¶ 6–12, 23, 24, 26; Webster ¶ 4.)

Pursuant to the mandate of § 801 of the PMML, the Board has established six milk marketing areas within the Commonwealth. Milk Marketing Area # 1 ("Area # 1"), the "Southeastern" consists of the five Southeastern Counties of Pennsylvania (Philadelphia, Delaware, Bucks, Montgomery, and Chester). Milk Marketing Area # 4 (Area # 4), the "South Central" is comprised of ten counties in South Central Pennsylvania (Fulton, Franklin, Adams, York, Lancaster, Juniata, Perry, Cumberland, Dauphin, and Lebanon), five of which abut the State of Maryland. The minimum price orders promulgated by the Board in effect for those two areas when the complaint in the captioned action was filed were Order A–890A, effective November 1, 1998 (Area # 1), and Order A–898, effective June 1, 1998 (Area # 4). Effective May 1, 1999 Order A–898 was superseded by Order A–900, which thereafter governed minimum milk prices in Area # 4.

In fixing milk prices, § 801 mandates that the Board shall include:

the amount necessary to yield a reasonable return to the producer, which return shall not be less than the cost of production and a reasonable profit to the producer . . . and a reasonable return on aggregate milk sales by milk dealers or handlers and stores selling milk. A reasonable return shall mean not less than a two and one-half percent (2½ %) nor more than a three and one-half percent (3½ %) rate of return based on net sales of price-controlled products determined in accordance with generally accepted accounting principles. . . . In ascertaining such returns, the board shall utilize available information concerning producers' cost of production and a cross-section representative of producers, dealers and stores in the area and shall consider unit costs of various types of products and of various sizes of containers.

31 Pa. Stat. Ann. § 700j–801.

Plaintiffs contend that the minimum wholesale milk prices mandated by the Board's Orders A–898, A–890A, and A–900 are designedly in excess of the reasonably achievable average variable costs associated with the operations of more efficient milk dealers and distributors. (Webster ¶ 6; Pl.'s Mot. for Sum. Jud.App. C, Havemeyer Aff. ("Havemeyer") ¶¶ 8–11.) Using Area # 4 as an example, Plaintiffs argue that the minimum wholesale "margin" (difference between minimum wholesale price and raw milk cost) for milk sold in gallon containers applicable to most supermarket and similar higher-volume deliveries fixed by Orders A–898 and A–900 is about 57 cents per gallon, whereas the reasonably achievable average variable costs incurred in performing those same functions is about 26 cents per gallon.

(Havemeyer ¶¶ 8, 9.) Defendants, however, assert that the Board considers fully absorbed total costs rather than variable costs when determining minimum wholesale milk prices. (Defs.' Ans. to Pl.'s Stat. ¶¶ 26–27.) Plaintiff contends that utilizing total costs, which are higher than variable costs, produces excessive profits for handlers and distributors.

Plaintiffs assert that several factors account for these "margins" in Area # 4, including: that five of the six dealers in the cross-section were dealers with plants within Area # 4, while there was only one out-of-state dealer; failure to reflect the lower costs experienced by larger or more cost efficient fluid milk dealers capable of selling milk to stores in the area; determining unit costs for each such dealer by the "total average cost" method, i.e., by including all costs incurred by said dealers, including all overhead-type expenses; making several "adjustments" or addons to the total average costs derived and thereby inflating the minimum wholesale prices; and allowing a 3.3% profit, which alone exceeds the profits generally realized by fluid milk processors and distributors in the rest of the country. While Defendants do not dispute these factual allegations, they contend that the prices determined by the Board are mandated by the law. Defendants do contest Plaintiffs' other explanations for the margins, such as: that the selection of the identity of milk dealers to be included in the "cross-section" were decided before the hearing as a result of a meeting/communications between Board staff and the milk dealers' forensic account; and the manner in which the Board weighs the data of the individual milk dealers. (Pl.'s Stat. of Undis. Facts ¶ 28–29; Defs.' Ans. to Pl.'s Stat. ¶ 28–29.)

Several milk dealers located within Areas # 1 and # 4 have been offering to sell and selling milk to stores in Maryland at prices below the minimum resale prices fixed by the Board's Orders A–890A and A–900, often as much as 15 to 25 cents per gallon less than the minimum prices that would be applicable were the sales made in Pennsylvania.[3] (Webster ¶ 7.)

Cloverland's efforts to solicit wholesale milk customers in Pennsylvania have been uniformly unsuccessful. Plaintiffs allege this is because: (a) no stores solicited by Cloverland were purchasing milk at prices which were above the Board's minimums; (b) no wholesale customer was willing to purchase milk from Cloverland so long as it could obtain milk at the same price from its local suppliers;[4] and (c) Cloverland is prohibited by PMML § 807 from selling, or offering to sell, milk for less than the minimum prices. (Webster ¶¶ 8, 9; Harris ¶ 25.) Defendants dispute that these are the reasons that Cloverland is unable to sell milk in Pennsylvania. However, David DeSantis, Chief of Enforcement and Accounting for the Board, admitted that most of the wholesale milk sold in Areas # 1 and # 4 is sold at the mandated minimum price. (Pl.'s Br. in Opp. to Mot. to Strike, Ex. A, DeSantis dep. ("DeSantis") at 60.)

As to retail prices, the minimum retail prices mandated by the Orders include retail "margins" (difference between wholesale price and minimum consumer or "out of store" price) that substantially exceed the reasonably achievable variable costs associated with the handling of milk in stores. Using Area # 4 as an example,

---

3. This hearsay statement is not supported in the record by admissible evidence and will not be considered in the court's decision. *See infra* Section II.

4. The court notes that Plaintiffs have thus far failed to provide admissible non-hearsay evidence supporting these allegations.

the minimum retail "margin" for milk sold in gallon containers is about 50 cents per gallon, whereas the reasonable average variable costs incurred by supermarkets in handling milk is about 15 cents per gallon. (Pl.-Intervs.' Mot. for Sum. Jud. Ex. C, Havemeyer Aff. ("Havemeyer II") ¶¶ 4, 9.) The prevailing consumer prices for milk sold by most retail stores in Maryland are below the minimum retail prices fixed by Orders A–890A and A900, in some cases as much as 30 to 40 cents per gallon less. (Pl.-Intervs.' Mot. for Sum. Jud. Ex. A, Spigler Aff. ("Spigler"); Pl.-Intervs.' Mot. for Sum. Jud. Ex. B, Weinreich Aff. ("Weinreich").)

### B. *Procedural Background*

Cloverland filed the complaint in this action on March 29, 1999, at which time the case was initially assigned to another judge. Motions to intervene were filed by the Pennsylvania Association of Milk Dealers ("PAMD") as a proposed defendant on April 7, 1999, and by the Milk Consumers, as proposed plaintiffs on May 13, 1999. The PAMD's motion has not yet been decided. The Milk Consumers' motion to intervene was granted on June 7, 1999, and their complaint was filed the same date. On June 11, 1999, Cloverland filed a motion for summary judgment which was fully briefed, including a brief in opposition submitted by the PAMD as amicus curiae. On August 26, 1999, the Milk Consumers filed a motion for summary judgment, and on October 15, 1999, Defendants filed a motion for summary judgment. The case was reassigned to this court on June 1, 2000. Oral argument concerning the cross-motions for summary judgment was conducted before this court on December 19, 2000, participating were Cloverland,

the Milk Consumers, Defendants, and the PAMD.

The court will first discuss Defendants' motion to strike certain declarations Plaintiffs filed in support of their motions for summary judgment. The court will next consider the PAMD's motion to intervene. Finally the court will discuss the issues in the cross-motions for summary judgment

### II. *Motion to Strike Declarations*

Defendants seek to strike the May 17, 1999 declaration of Robert Havemeyer in its entirety and portions of the August 24, 1999 declaration of Robert Havemeyer, the declaration of Lawrence Webster, and the declaration of Dr. Harold Harris. Defendants assert the following reasons for seeking to strike certain portions of the declarations made by the witnesses: First, portions of the declaration of Webster and the May 17, 1999 declaration of Havemeyer refer to the Board's Order A–898 which was superseded by Order A–900, effective May 1, 1999. And second, while none of the witnesses are lawyers, portions of the declarations of Webster, Havemeyer, and Harris offer legal conclusions, including opinions on the ultimate issue of the case—that the PMML imposes excessive burdens on interstate commerce.

The court finds that the references to Order A–898 are moot. Therefore, the court will not consider the portions of Webster's declaration or Havemeyer's May 17, 1999 declaration that rely on Order A–898.[5] However, to the extent that Havemeyer's May 17, 1999 declaration is useful in considering his August 24, 1999 declaration which analyzes the superseding Order A–900, the court will utilize the

---

**5.** Defendants also argue that summary judgment should be granted in Defendants' favor because the Board's Order A–898 was superseded by Order A–900. While Plaintiffs' claims

in reference to Order A–898 are indeed moot, the claims and arguments apply similarly to Order A–900, and will be considered in the instant opinion.

earlier declaration. The court also finds that the portions of the declarations of Webster, Havemeyer, and Harris which offer legal opinions are not proper testimony and will not be considered by the court.

In oral argument, the PAMD argued that other evidence submitted by Plaintiffs were inadmissible hearsay statements. To the extent that any hearsay statements are not supported in the record by admissible evidence, they will not be considered in the court's decision. The court will not grant Defendants' motion to strike, but in deciding the instant cross-motions for summary judgment, the court will consider only those portions of the evidence, as discussed *supra,* that is proper admissible evidence.

### III. *Pennsylvania Association of Milk Dealers' Motion to Intervene*

■ The PAMD is an association made up primarily of the milk dealers which process and supply wholesale milk in Pennsylvania. The PAMD seeks to intervene as a defendant in the action. The PAMD seeks either intervention as of right, pursuant to Fed.R.Civ.P. 24(a)(2), or permissive intervention, pursuant to Fed. R.Civ.P. 24(b)(2). A party seeking to intervene as of right pursuant to Rule 24(a)(2) is entitled to do so if four conditions are met: (1) the motion is timely; (2) the applicant has an interest relating to the property or transaction which is the subject of the action; (3) the applicant is so situated that the disposition of the action may as a practical matter impair or impede its ability to protect its interest; and (4) the applicant's interests are inadequately represented by the existing parties to the litigation. *Kleissler v. United States Forest Service,* 157 F.3d 964, 969 (3d Cir.1998).

It is undisputed that the intervention motion was timely filed in the present case. Plaintiffs oppose intervention based upon the other three necessary conditions. The court finds that the final requirement of Rule 24(a)(2), that the existing parties would not adequately represent the proposed intervenor, has not been satisfied by the PAMD. Plaintiffs correctly argue that Defendants' interest is in defending the constitutionality of the PMML. Indeed, throughout the course of this litigation Defendants have taken the position that the PMML does not violate the Commerce Clause and have vigorously defended that position.

■ "The burden of establishing inadequacy of representation by existing parties varies with each case. A government entity charged by law with representing a national policy is presumed adequate for the task...." *Id.* at 972. While this presumption is not as substantial when the government's and the proposed intervenor's interests are not identical, *see id.,* in the case at bar, the PAMD's interests overlap with Defendants' interests, and therefore a presumption exists in favor of adequate representation by Defendants. The PAMD's interest is in protecting its members' profits, derived from the margin between the federally mandated producer milk prices and the wholesale milk prices mandated by the PMML. Consequently, the PAMD members' economic interests predicate that it will argue for the continued viability of the PMML, the position that the PAMD has defended throughout the litigation. Similarly, Defendants' position is that the PMML does not violate the Commerce Clause. While the presumption in favor of adequate representation by governmental defendants may be rebutted, the PAMD has failed to meet its burden of demonstrating inadequacy of representation. In fact, as Defendants have vigorously defended the constitutionality of the PMML throughout the litigation, the pre-

sumption has proved correct. Accordingly, the PAMD's motion to intervene as of right will be denied.

■ The PAMD alternatively seeks permissive intervention, pursuant to Rule 24(b) which provides, in pertinent part: "Upon timely application anyone may be permitted to intervene in an action . . . when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Fed.R.Civ.P. 24(b)(2). There is no question that PAMD's application for permissive intervention, filed within two weeks of Cloverland's complaint, is timely. While allowing the PAMD to intervene at this late stage of the litigation may cause a minor delay in the final adjudication of the action, the Third Circuit has directed that "because the [putative intervenor's] intervention motion was filed so soon after the complaint, the district court should not consider the present potential for delay as a factor counseling against intervention." *Brody By and Through Sugzdinis v. Spang*, 957 F.2d 1108, 1125 (3d Cir.1992).

Plaintiffs argue that permissive intervention should be denied because the PAMD seeks to introduce issues and evidence unrelated to the Commerce Clause analysis that will unduly delay this litigation. Specifically, the PAMD indicates that it would introduce evidence regarding the economic impact that striking down the PMML would have on its members; Plaintiffs assert that this is not relevant to the central Commerce Clause issue in the case. The court agrees that if the PMML is found to violate the Commerce Clause, then evidence of economic harm to PAMD's members would not be relevant. However, as discussed *infra*, the court

finds that one of the PMML's intended purposes, to ensure an adequate supply of milk to the residents of Pennsylvania, is a legitimate state purpose that could justify the statute unless the incidental burdens on interstate commerce clearly exceed the benefits. *Pike v. Bruce Church Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). Therefore, it is possible that PAMD's evidence would be relevant to the question of whether the PMML provides a local benefit by ensuring an adequate supply of milk. The court also finds that PAMD's defense of the PMML does have question of law and fact in common with the main action.

The captioned action was reassigned to this court on June 1, 2000. At that time, discovery was concluded and the cross-motions for summary judgment were ripe. In light of the PAMD's pending motion to intervene, the PAMD was permitted to submit, as amicus curiae, a brief in opposition to Plaintiffs' motions for summary judgment. Additionally, the PAMD was permitted to participate in the oral argument concerning the cross-motions for summary judgment conducted before this court on December 19, 2000. However, as amicus curiae, the PAMD has not been permitted to enter evidence into the record. This court finds that the PAMD's application for permissive intervention should be granted and the PAMD should be permitted to supplement the record for use in the pending cross-motions for summary judgment. Accordingly, the court will reopen discovery for a period of 30 days, during which time all parties, including the PAMD, may supplement the record with additional admissible evidence. *See State of New York v. Brown*, 721 F.Supp. 629 (D.N.J.1989) (allowing parties to supplement the record on cross-motions for summary judgment such that the court

had sufficient evidence to properly conduct *Pike* balancing test).

## IV. Cross–Motions for Summary Judgment

### A. Legal Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis which would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* at 249, 106 S.Ct. 2505. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *White v. Westinghouse EEC. Co.*, 862 F.2d 56, 59 (3d Cir.1988).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, and designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." *Id.*

The standards governing the court's consideration of Federal Rule 56(c) cross-motions are the same as those governing motions for summary judgment, although the court must construe the motions independently, viewing the evidence presented by each moving party in the light most favorable to the nonmovant. *Raymond Proffitt Found. v. U.S. Envt'l. Protection Agency*, 930 F.Supp. 1088, 1096 (E.D.Pa. 1996).

### B. Dormant Commerce Clause

Plaintiffs argue that two aspects of the PMML violate the Commerce Clause. Cloverland argues that the minimum wholesale prices, as established by the Boards' Orders A–890A and A–900, discriminate against out-of-state handlers and distributors. The Milk Consumers argue that the minimum retail·prices mandated by the PMML in Pennsylvania also discriminate against interstate commerce.

■ The Constitution delegates to Congress the power "[t]o regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. The Commerce Clause allows Congress to enact legislation providing for the regulation of prices paid to farmers for their products. *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 192, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994). An affirmative exercise of that power led to the promulgation of federal orders setting minimum milk prices paid to producers, including Middle Atlantic Marketing Order # 4. *See id.* The Commerce Clause also limits the power of the Commonwealth of Pennsylvania to adopt regulations that discriminate against interstate commerce. *See id.* This negative aspect of the Commerce Clause, known as the dormant Commerce Clause, prohibits protectionist state regulation designed to ben-

efit in-state economic interests by burdening out-of-state competitors. *Fulton Corp. v. Faulkner*, 516 U.S. 325, 330, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996).

The Supreme Court's most recent analysis of whether state milk price regulation violates the dormant Commerce Clause instructs that courts "eschew[ ] formalism for a sensitive, case-by-case analysis of purposes and effects." *West Lynn Creamery*, 512 U.S. at 201, 114 S.Ct. 2205. Using this flexible approach, the court must determine whether the challenged Pennsylvania statute, the PMML, as a practical matter, discriminates against interstate commerce. *Id.*

■ Perhaps the most difficult challenge in determining whether a state statute violates the dormant Commerce Clause is deciding what level of scrutiny must be applied to the statute in question. The courts have developed a two-tier analysis to determine if an action violates the dormant Commerce Clause. First, whether the ordinance discriminates against interstate commerce; and second, whether the ordinance imposes a burden on interstate commerce that is clearly excessive in relation to the putative local benefits. *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 390, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) (citations omitted). To determine whether the ordinance discriminates against interstate commerce, for the first step, discrimination is defined as the "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Harvey & Harvey, Inc. v. County of Mercer Pennsylvania*, 68 F.3d 788, 797 (3d Cir. 1995) (citing *Oregon Waste Syst. Inc. v. Department of Environmental Quality of Oregon*, 511 U.S. 93, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994)). If a state law is shown to discriminate against interstate commerce "either on its face or in practical effect," *Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986), then the law "is per se invalid, save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." [6] *C & A Carbone, Inc.*, 511 U.S. at 392, 114 S.Ct. 1677 (citing

**6.** Defendants dispute whether discriminatory effects can trigger heightened scrutiny. However, this court finds that Supreme Court and Third Circuit law agree that either discriminatory purpose or effect triggers heightened scrutiny. *Carbone*, 511 U.S. at 392, 114 S.Ct. 1677; *West Lynn Creamery*, 512 U.S. at 193–201, 114 S.Ct. 2205; *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984); *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979); *Taylor*, 477 U.S. at 138, 106 S.Ct. 2440; *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Res.*, 504 U.S. 353, 358–61, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992); *Brown–Forman Distillers, Corp. v. New York State Liquor Authority*, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986) ("We have ... recognized that there is no clear line separating the category of state regulation that is virtually per se invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach."); *Harvey & Harvey*, 68 F.3d 788, 798 (3d Cir.1995) (explaining that the Third Circuit had "expressed some doubt whether a showing of discriminatory effect alone could suffice ... [b]ut *Carbone* and the entire line of recent Supreme Court cases have clarified that either purpose or effect will trigger strict scrutiny analysis."). Nevertheless, as discussed *infra*, the more difficult question is whether practical effects of the statute constitute discriminatory effects so as to trigger heightened scrutiny or merely incidental burdens on interstate commerce so as to trigger *Pike* balancing. *See Norfolk Southern Corp. v. Oberly*, 822 F.2d 388 (3d Cir. 1987) ("The distinction between the 'discriminatory effects' found in *Hunt* and *Bacchus* and 'incidental burdens,' to which a balancing test is applied, is both important and hazy.") (citing *Brown–Forman*, 476 U.S. at 573, 106 S.Ct. 2080).

*Maine v. Taylor,* 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986)). But if the ordinance does not discriminate against interstate commerce either in purpose or effect, the second step of the commerce clause analysis requires application of the *Pike* "balancing test whereby the statute will be upheld unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Harvey & Harvey, Inc.,* 68 F.3d at 797 (citing *Pike v. Bruce Church Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)).

### 1. *Heightened Scrutiny*

■ Plaintiffs argue that heightened scrutiny is triggered by both the discriminatory purpose and discriminatory effects of the PMML. With regard to the purpose of the PMML, the statute declares that it was "enacted for the purpose of regulating and controlling the milk industry in the Commonwealth, for the protection of the public health and welfare and for the prevention of fraud." 31 Pa. Stat. Ann. § 700j–101. The PMML gives the Board authority to establish milk prices "as will be most beneficial to the public interest, best protect the milk industry of the Commonwealth and insure a sufficient quantity of pure and wholesome milk to inhabitants of the Commonwealth, having special regard to the health and welfare of children residing therein." 31 Pa. Stat. Ann. § 700j–801. "When choosing the applicable Commerce Clause standard of review, a court 'assume[s] that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces [it] to conclude that they could not have been a goal of the legislation.'" *Norfolk Southern Corp. v. Oberly,* 822 F.2d 388, 403 (3d Cir.1987) (quoting *Clover Leaf Creamery,* 449 U.S. at 463 n. 7, 471 n. 15, 101 S.Ct. 715) (citation omitted).

Drawing from the language of the statute, the courts of Pennsylvania have declared that "[t]he purpose of the Law 'is to regulate the sale of milk and milk products so as to ensure that an adequate supply of milk exists and to establish a uniform economic condition for suppliers of milk.'" *School Dist. of Philadelphia v. Pennsylvania Milk Marketing Bd.,* 683 A.2d 972, 978 (Pa.Cmwlth.1996) (citing *Township of Muhlenberg v. Clover Farms Dairy Co.,* 665 A.2d 544, 548 (Pa.Cmwlth.1995)). Plaintiffs dispute that the purpose is to insure a sufficient quantity of milk, and instead contend that the real purpose is to protect the market share and profits of the Pennsylvania handlers and distributors by "protect[ing] the milk industry of the Commonwealth . . . ." 31 Pa. Stat. Ann. § 700j–801.

While the language of the PMML describing the need to "protect the milk industry of the Commonwealth" does suggest a possible protectionist intent, the court is not convinced that the purpose of the PMML was economic protectionism any more than that it was doing what was believed to be necessary to insure an adequate supply of milk. Furthermore, the PMML sets wholesale milk prices in Pennsylvania which apply to all handlers and distributors, regardless of whether they are Pennsylvania or out-of-state companies. On its face, the statute does not prohibit out-of-state companies from participating in the milk industry in Pennsylvania, but creates prices which affect the industry as a whole. This is different from the New York state milk-pricing statute struck down in *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935), which allowed dealers to bring out-of-state milk into the state, but prevented them from selling the imported milk in New York, unless the dealers had paid their out-of-state producers the same

price paid to in-state producers. The Supreme Court found that the New York state statute projected its legislation into other states, and found that it violated the Commerce Clause, in part because the statute sought "[t]o keep the system unimpaired by competition from afar." *Id.* at 519, 55 S.Ct. 497. The PMML does not on its face discriminate against interstate commerce, and the court cannot hold, without more, that its purpose is to benefit in-state economic interests at the expense of out-of-state interests.

The court next turns to whether the PMML discriminates in effect. The Third Circuit has stated, "[i]f a statute's purpose is not manifestly discriminatory, the court must determine 'how directly [the statute] burdens interstate commerce and how evenhandedly it impacts interstate and intrastate commerce.'" *Harvey & Harvey, Inc. v. County of Chester,* 68 F.3d 788, 797–98 (citing *Stephen D. DeVito, Jr. Trucking v. RISWMC,* 770 F.Supp. 775, 781 (D.R.I.1991)).

Plaintiffs concentrate on two separate effects of the PMML that they assert are discriminatory: first, that the retail price for milk in Pennsylvania is higher than in Maryland. Second, Plaintiffs claim that out-of-state companies like Cloverland cannot utilize their superior efficiency by selling milk at lower prices in Pennsylvania, and as a result are not able to break into the market in Pennsylvania. Cloverland's failure to find buyers in Areas # 1 and # 4, combined with the fact that the great majority of distributors and handlers in those areas are in-state Pennsylvania companies, demonstrates discrimination in effect.

Addressing the disparity in the retail price of milk in Pennsylvania and Maryland, while there is evidence that milk costs consumers more in Pennsylvania, the court does not find that discrimination against interstate commerce is thereby demonstrated. In determining whether there is discrimination against interstate commerce, discrimination is defined as the "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Harvey & Harvey, Inc.,* 68 F.3d at 797 (citing *Oregon Waste Syst. Inc.,* 511 U.S. 93, 114 S.Ct. 1345). Even if the price disparity is viewed as differential treatment, it is those residents of Pennsylvania, those with "in-state" economic interests, that are in a worse position as consumers than the out-of-state residents of Maryland. Therefore, while the price disparity could be viewed as discriminating against in-state interests, it cannot be viewed as discriminating against interstate commerce. Accordingly, the price disparity is not effective discrimination.

The other effect that Plaintiffs assert is discriminatory is that out-of-state companies like Cloverland cannot find customers in Pennsylvania because the PMML prevents them from utilizing their increased efficiency by selling milk below the mandatory minimum wholesale prices. In support thereof, Plaintiffs point to Cloverland's failure to find buyers in Areas # 1 and # 4, combined with the fact that the great majority of distributors and handlers in those areas are in-state Pennsylvania companies.

The parties do not dispute that there are more in-state than out-of-state handlers and distributors operating in Areas # 1 and # 4. However, this court does not agree that this type of differential effect alone is an example of the effects which the Supreme Court and the Third Circuit would find sufficient to trigger heightened scrutiny. In *Tolchin v. Supreme Court of the State of New Jersey,* 111 F.3d 1099 (3d Cir.1997), the Third Circuit refused to apply heightened scrutiny in evaluating a

New Jersey requirement that lawyers maintain a bona fide office in New Jersey and attend continuing legal education skills and methods courses. The court held that New Jersey lawyers with small practices are affected by the requirement as much as out-of-state lawyers, and "[a]ny incidental discrimination caused by the bona fide office requirement is not based on residency status, but on the size and type of an attorney's practice." *Id.* at 1108. Similarly, in the case at bar, while there is a disparity between the number of in-state and out-of-state dealers doing business in Areas # 1 and # 4, and it appears to be difficult to break into the market without lowering prices below what the PMML permits, this is not a result of residency, i.e., being an in-state versus an out-of-state company. The PMML mandates minimum wholesale prices, regardless of whether the seller is an in-state or an out-of-state company. Therefore, a more efficient in-state company has the same barrier to finding new customers that an out-of-state company has, namely, being prevented from utilizing the efficiency to sell at lower prices. The cause common to efficient in-state and out-of-state sellers alike, preventing them from attracting new customers, appears to be historical business relationships and to some extent, transaction costs associated with changing suppliers. Buyers in Areas # 1 and # 4 continue to buy from the same handlers and distributors (who are mostly Pennsylvania companies) because there is no incentive to change, while increased transaction costs deter change.

This differential effect arguably would not exist in the absence of the PMML, but like in *Tolchin,* it is not directly linked to residency. This is different from the statute struck down in *Dean Milk Co. v. City of Madison, Wisconsin,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951), which mandated that all milk sold in the city of Madison be pasteurized within five miles of the city limits. In *Dean Milk,* the state statute's direct and necessary effect is to prevent companies from pasteurizing milk outside of the state. In the case *sub judice,* the PMML does not necessarily prevent out-of-state companies from selling in Areas # 1 and # 4, but combined with market forces, it has caused the disparity. Therefore, the court is inclined to find that the effects asserted by Plaintiffs are not sufficient to trigger heightened scrutiny.[7]

### 2. *Pike Balancing*

The second step of the Commerce Clause analysis requires application of the *Pike* "balancing test whereby the statute will be upheld unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Harvey & Harvey, Inc.,* 68 F.3d at 797 (citing *Pike v. Bruce Church Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)). Plaintiffs argue first, that Defendants have not presented any legitimate local interest that could justify the PMML, and second, that even if there are putative local benefits, they are outweighed by the clearly excessive burden on interstate commerce. Defendants present three main

---

7. However, the court notes that the PMML presents a close case with regard to whether to apply heightened scrutiny. In *Carbone,* the Supreme Court struck down a local waste flow control ordinance because it "depriv[ed] competitors, including out-of-state firms, of access to a local market." 511 U.S. at 386, 114 S.Ct. 1677. In *Tolchin,* the Third Circuit cited to *Carbone* and its progeny, and in dicta stated that "[b]ecause we have found no such deprivation, those cases do not mandate that we apply heightened scrutiny here." 111 F.3d at 1108. While an indirect effect of the PMML is to deprive competitors, including out-of-state companies, of access to the Pennsylvania market, i.e., milk consumers, the effect is not mandated by the statute as it is in *Carbone* or *Dean Milk.*

arguments in response; first, that the court should not reach the *Pike* balancing because the PMML is applied to in-state and out-of-state milk distributors alike and is therefore a burden on commerce, not interstate commerce. Second, Defendants argue that *Pike* only requires a rational relationship between the PMML and its intended benefits, which Defendants argue exists. And third, even if *Pike* requires more than a rational relationship, any incidental burdens on interstate commerce are not clearly excessive in relation to the local benefits of the PMML.

Defendants rely on the Third Circuit case of *Norfolk Southern Corp. v. Oberly*, 822 F.2d 388 (3d Cir.1987), for the proposition that "[w]here the 'burden' on out-of-state interests is no different from that placed on competing in-state interests ... it is a burden on commerce rather than a burden on interstate commerce," and the out-of-state interests are not entitled to more stringent review than arbitrary and capricious review under the Due Process Clause or rational basis review under the Equal Protection Clause. *Id.* at 406. However, it is somewhat difficult to glean from *Norfolk Southern* whether the court applied the *Pike* balancing test or a lesser standard. Even though the court found that there were putative benefits to the statute in question, instead of applying the arbitrary and capricious review or the rational basis review, it proceeded to consider whether there were incidental burdens, presumably to utilize in the *Pike* balancing analysis which the court held was appropriate in the case. *Id.* at 405.

The *Norfolk Southern* court viewed the necessary "incidental burden" narrowly and required that the only relevant burden "is the degree to which the state action incidentally discriminates against interstate commerce relative to intrastate commerce. It is a comparative measure." *Id.*

at 406. The court held that "the record reveals no legally relevant burden on interstate commerce that could be found to be 'excessive.'" *Id.* at 406. In conclusion the court held: "Finding no burden that discriminates against out-of-state interests or in favor or [sic] in-state interests, we conclude that the defendants are entitled to summary judgment." *Id.* at 407. Thus it appears that the court did apply the *Pike* balancing test. Therefore, there appears to be an inconsistency between the language requiring application of the lesser Due Process or Equal Protection standards and the finding that there was no incidental burden.

The Third Circuit's opinion in *Norfolk Southern* was issued in 1987. Supreme Court and Third Circuit opinions have since refined aspects of dormant Commerce Clause jurisprudence such that the holdings of *Norfolk Southern* on which Defendants rely no longer appear to be good law. *Virgin Islands Port Auth. v. Virgin Islands Taxi Ass'n*, 979 F.Supp. 344, 351 n. 6 (D.Vi.1997) (*per curiam*) (rejecting, in light of subsequent Supreme Court case of *Carbone*, *Norfolk Southern*'s assertion that statutes must be upheld when the impact on out-of-state and in-state competitors was equal); *see also Harvey & Harvey, Inc., v. County of Chester*, 68 F.3d 788, 798 (3d Cir.1995) ("*Carbone* explicitly rejected the argument that a disputed statute would have to favor all in-state businesses as a group—a statute may be invalid if it favors only a single or finite set of businesses."). In *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 390, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), the Supreme Court struck down a town ordinance requiring that solid waste processed or handled within the town be processed or handled in the town's transfer station. The Court held that a law which simply favors one in-state business, thus burdening all other in-

state and out-of-state businesses equally, can violate the Commerce Clause. *Id.* at 391, 114 S.Ct. 1677. In fact, the Court held that an ordinance favoring "a single local proprietor ... makes the protectionist effect of the ordinance more acute." *Id.*

Even more recently, in *Tolchin,* the Third Circuit applied *Pike* balancing and described the incidental burdens of the requirement at issue quite differently from *Norfolk Southern.* At issue in *Tolchin* was New Jersey's requirement that all attorneys who practice within the state must maintain a bona fide office within the state. The court found that the requirement placed a burden on "those who practice solely, but sporadically in New Jersey [and] those who occasionally practice in New Jersey as part of a larger practice based in another state." 111 F.3d at 1109. Regardless of the fact that the requirement thus burdened both in-state and out-of-state interests, the court did find an incidental burden to be considered in *Pike*

balancing: "The requirement's burden affects interstate commerce in that it limits the mobility of some lawyers and reduces the options for consumers of the services they· provide." *Id.* Thus the "incidental burden" that the court considered was the actual effect that the requirement had on interstate commerce, rather than *Norfolk Southern*'s "comparative measure" of the "degree to which the state action incidentally discriminates against interstate commerce relative to intrastate commerce." *Norfolk Southern,* 822 F.2d at 406.[8]

For all of these reasons, the court rejects Defendants' assertion that a lower level of scrutiny, as opposed to *Pike* balancing, should be applied in the instant action.[9] Additionally, in light of more recent case law, the court finds that the narrow definition of "incidental burdens" suggested by *Norfolk Southern* is no longer good law, and the court instead will consider PMML's practical effects that burden interstate commerce.[10]

**8.** However, the court finds that even if the "comparative measure" of "incidental burden" as described in *Norfolk Southern* were required, the PMML still produces such effects because the out-of-state handlers like Cloverland are disadvantaged relative to the in-state handlers currently doing business in Areas # 1 and # 4. *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) (applying *Pike* balancing to Minnesota law that applied to in-state and out-of-state firms alike, which prohibited the retail sale of milk in plastic jugs, because the incidental burdens had the effect of advantaging in-state commercial interests relative to out-of-state competition in the same market); *see also Norfolk Southern,* 822 F.2d at 406, 401 n. 18 (discussing *Clover Leaf Creamery* ).

**9.** The court also rejects Defendants' argument that *Pike* requires only a rational relation between the state law and the intended benefits. At oral argument, the PAMD relied on language from *Tolchin* for this argument; however, a close reading of *Tolchin* reveals that

*Pike* balancing requires both a rational relation between the law and its intended benefits and a finding that the burden on interstate commerce does not clearly outweigh the benefits received. 111 F.3d at 1109, 1110; *see also Pike,* 397 U.S. at 142, 146, 90 S.Ct. 844.

**10.** The other circuit courts of appeals are also in disagreement about what constitutes an incidental burden on interstate commerce and whether a law that is applied evenhandedly in-state and out-of-state can trigger *Pike* balancing. *Compare Shamrock Farms Co. v. Veneman,* 146 F.3d 1177, 1179 (9th Cir.1998) ("Even laws that are applied evenhandedly and impose only an incidental burden on interstate commerce can be unconstitutional if the burden on commerce is 'excessive in relation to the putative local benefits.' ") (citation omitted) and *Pelican Chapter, Associated Builders & Contractors, Inc. v. Edwards,* 128 F.3d 910, 918 (5th Cir.1997) ("In contrast, state laws that regulate evenhandedly with only incidental effects on interstate commerce are invalid only if the burden imposed on

### a. *Wholesale Milk Prices*

The court finds that the PMML's minimum wholesale prices do produce incidental burdens on interstate commerce. The minimum wholesale prices established do act to deter milk retailers from purchasing their wholesale milk from new suppliers, including out-of-state handlers like Cloverland. In calculating minimum resale prices, the PMML requires that the Board consider only the costs of the average of the firms doing business in the Area in question. This utilizes higher costs and creates a higher minimum price than more efficient firms require. More efficient out-of-state firms with lower costs are prohibited from utilizing their competitive advantage and attracting new customers by offering milk at lower prices. "[O]ut-of-state firms simply have no reasonable opportunity to bid for wholesale milk business in Southeastern and Southcentral Pennsylvania. For under those circumstances, the in-state wholesale consumers' only decision criteria are service and local reputation factors, which are insignificant compared to the bottom line of price." (Harris ¶ 25.) As a result, most of the wholesale milk sold in Areas # 1 and # 4 is sold at the mandated minimum price. (DeSantis at 60.) Therefore, the clear effect produced on interstate commerce is that less out-of-state milk passes across the Pennsylvania border to be sold in Pennsylvania than would in the absence of the PMML.

This burden on interstate commerce must be weighed against the benefits of the PMML. Only if the burden is clearly excessive in relation to the putative local benefits will the PMML be struck down under the *Pike* balancing. However, when a law burdens interstate commerce but serves some legitimate local purpose, the availability of a less burdensome alternative is relevant to the inquiry. *Pike*, 397 U.S. at 142, 90 S.Ct. 844 ("[T]he extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."). Although one of the PMML's purported purposes was found to be legitimate *supra:* "to ensure that an adequate supply of milk exists," the court finds little, if any, evidence in the record that the PMML produces the benefits that the statutory language suggests. The PMML was passed before the Middle Atlantic Marketing Order # 4 was enacted by the United States Secretary of Agriculture which regulates the minimum prices that must be paid to milk producers in Southeastern and South Central Pennsylvania, among other areas. The Secretary is required by law to fix such prices so as to "ensure a sufficient quantity of pure and wholesome milk to meet current needs and further assure a level of farm income adequate to maintain productive capacity sufficient to meet anticipated future needs, and be in the public interest." 7 U.S.C.

interstate commerce is 'clearly excessive in relation to the putative local benefits.' A state law regulates evenhandedly when it is both facially neutral and treats interstate and intrastate interests equally.") *with Automated Salvage Transport, Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 75 (2d Cir.1998) ("We have explained that the 'incidental burdens' to which *Pike* refers 'are the burdens on interstate commerce that exceed the burdens on intrastate commerce.' Where a regulation does not have this disparate impact on interstate commerce, then 'we must conclude' that ... [it] has not imposed any 'incidental burdens' on interstate commerce that 'are clearly excessive in relation to the putative local benefits.' Thus, the minimum showing required to succeed in a Commerce Clause challenge to a state regulation is that it have a disparate impact on interstate commerce. The fact that it may otherwise affect commerce is not sufficient.") (citations omitted) and *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1131 (7th Cir.1995).

§ 608c(18). Therefore, even in the absence of the PMML, the Secretary is now required to "ensure a sufficient quantity of pure and wholesome milk to meet current needs."

Evidence that the federal minimum pricing is ensuring an adequate supply of milk is apparent by considering that states subject to Middle Atlantic Marketing Order # 4, other than Pennsylvania, have not had a shortage of milk although they do not have state minimum pricing. Defendants have failed to produce any contrary evidence that the PMML is necessary to ensure an adequate supply of milk within Pennsylvania. This defect is especially glaring when Pennsylvania milk production is considered. The parties do not dispute that much more milk is produced in Pennsylvania than is consumed in Pennsylvania. There is also no dispute that only approximately half of the producer milk regulated by Federal Order # 4 is used for fluid purposes, the remainder being used for Class II and Class III products. Accordingly, the court is without sufficient evidence that establishes that the PMML does produce legitimate local benefits. *See McNeilus Truck and Mfg., Inc. v. Ohio ex rel. Montgomery,* 226 F.3d 429, 444 (6th Cir.2000) (quoting *Pike,* 397 U.S. at 142, 90 S.Ct. 844) ("[T]he lack of any significant local benefit that does not already exist means that the State of Ohio could not demonstrate that the benefits of the statute outweigh even an incidental burden on interstate commerce posed by the state's licensing requirements. Thus, even were we to conclude that this statute only has an incidental effect on interstate commerce, we would still find that the burden it imposes is 'clearly excessive in relation to the putative local benefits.' ") The parties who appear to be most benefitted by the PMML are those Pennsylvania handlers and distributors who have historically been selling their milk in Areas # 1 and # 4. *See Harvey & Harvey.,* 68 F.3d at 798 (holding that "a statute may be invalid if it favors only a single or finite set of businesses").

Furthermore, the Supreme Court has struck down state statutes regulating milk pricing in the past whose purported purpose was to ensure adequate supplies of milk for the public health. In *West Lynn Creamery,* the Supreme Court described its much earlier ruling in *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935), as "the leading case," 512 U.S. at 196 n. 11, 114 S.Ct. 2205 (1994), and quoted extensively from Justice Cardozo's opinion. Cardozo explained:

New York asserts her power to outlaw milk [from outside the state] by prohibiting its sale thereafter if the price that has been paid for it to the farmers of Vermont is less than would be owing in like circumstances to farmers in New York. The importer in that view may keep his milk or drink it, but sell it he may not.

Such a power, if exerted, will set a barrier to traffic between one state and another as effective as if customs duties, equal to the price differential, had been laid upon the thing transported. Imposts or duties upon commerce with other countries are placed, by an express prohibition of the Constitution, beyond the power of a state, 'except what may be absolutely necessary for executing its inspection Laws.' Constitution, art. 1, s 10, cl. 2; *Woodruff v. Parham,* 75 U.S. 123, 8 Wall. 123, 19 L.Ed. 382. Imposts and duties upon interstate commerce are placed beyond the power of a state, without the mention of an exception, by the provision committing commerce of that order to the power of the Congress. Constitution, art. 1, s 8, cl. 3.

*Baldwin,* 294 U.S. at 521–22, 55 S.Ct. 497. The PMML's practical effect is to increase the price that Cloverland and other out-of-state handlers must charge for wholesale milk in Pennsylvania which, like in *Baldwin,* essentially "set[s] a barrier to traffic between one state and another as effective as if customs duties, equal to the price differential, had been laid upon the thing transported." *Id.* The Court in *Baldwin* struck down the New York statute and explained:

> The argument is pressed upon us, however, that the end to be served by the Milk Control Act is something more than the economic welfare of the farmers or of any other class or classes. The end to be served is the maintenance of a regular and adequate supply of pure and wholesome milk, the supply being put in jeopardy when the farmers of the state are unable to earn a living income.... Let such an exception be admitted, and all that a state will have to do in times of stress and strain is to say that its farmers and merchants and workmen must be protected against competition from without, lest they go upon the poor relief lists or perish altogether. To give entrance to that excuse would be to invite a speedy end of our national solidarity. The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division.

*Id.* at 522–523, 55 S.Ct. 497. Relying on this reasoning, in *West Lynn Creamery,* the Court found that a Massachusetts milk pricing order also violated the Commerce Clause, even though the asserted purpose was to ensure an adequate supply of milk to the people of Massachusetts.

Similarly, in the case *sub judice,* it appears that the burdens on interstate commerce caused by the minimum wholesale prices of the PMML may be clearly excessive in relation to the putative local interest of ensuring an adequate supply of milk. This is undoubtedly true if the purported interest is not produced by the PMML, but by Federal Order # 4, which continues to ensure an adequate supply of milk in Pennsylvania by mandating the minimum price milk producers receive. As discussed in *supra* Section III, the court will allow the parties, including the PAMD to supplement the record before the court to be used in conducting the *Pike* balancing test. However, the court directs the parties to supplement the record with factual evidence rather than by providing additional memoranda that rehash the arguments that the court has already decided herein.

### b. *Retail Milk Prices*

The Milk Consumers argue that the dormant Commerce Clause is also violated by the minimum retail prices as mandated by the PMML. The Milk Consumers assert that the minimum retail prices also fail the *Pike* balancing and rely primarily on the Supreme Court cases of *H.P. Hood v. Du Mond,* 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949) and *West Lynn Creamery.* They cite *Hood* for its statement that "every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any." 336 U.S. at 665, 69 S.Ct. 787. However, if Pennsylvania residents are required to pay higher retail milk prices than in other states, this is not the type of exploitation that *Hood* contemplated. The retail prices created pursuant to the PMML do not affect out-of-state interests, but only burden in-state residents by forcing them to pay higher retail prices within

Pennsylvania. This effect does not implicate interstate commerce in any way.

In an attempt to refute this dispositive fact, the Milk Consumers cite *West Lynn Creamery* which rejected the state's contention that any claim of economic protectionism must fail because only in-state consumers feel the effect of a retail price increase. The Court held that the state's regulatory scheme did violate the Commerce Clause because it was similar to a tariff,[11] and "[t]he cost of a tariff is also borne primarily by local consumers, yet a tariff is the paradigmatic Commerce Clause violation." 512 U.S. at 203, 114 S.Ct. 2205. However, while the higher retail prices in Pennsylvania are also borne by local consumers, unlike a tariff or the state regulatory scheme struck down in *West Lynn Creamery* which acted like a discriminatory tax, there is no evidence that the minimum retail prices established by the PMML in any way discriminate against out-of-state interests. Accordingly, the Milk Consumers gain no support from either *Hood* or *West Lynn Creamery*. As the Milk Consumers have not submitted any evidence demonstrating that the minimum retail milk prices create any incidental burdens on interstate commerce, there is no way that the burden can be clearly excessive in relation to any putative local interest under the *Pike* balancing.

### C. *Eleventh Amendment immunity*

■ Defendants also argue that the Board is immune from suit in federal court based upon the Eleventh Amendment. The court finds that the Defendant Board, a state agency, is entitled to Eleventh Amendment immunity. *See Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (holding that a federal court does not have jurisdiction to entertain claims against state defendants, even when the relief sought is prospective injunctive relief only). However, the individual Defendant Board members are not immune from suit based upon the Eleventh Amendment. *See Ex Parte Young*, 209 U.S. 123, 155–56, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (holding that a suit in federal court is not barred by the Eleventh Amendment if it seeks prospective relief against a state official based on a continuing violation of federal law).[12] Accordingly, summary judgment will be granted in favor of the Defendant Board, but not the individual Defendants.

### D. *Section 1983 Claim*

■ Plaintiffs' second claim for relief is a civil rights claim, pursuant to 42 U.S.C. § 1983. Based upon the alleged violation of § 1983, Plaintiffs' seek attorneys' fees under 42 U.S.C. § 1988. Defendants' assert that § 1983 does not create any substantive rights, and therefore Plaintiffs' civil rights claim must fail because it is premised directly upon § 1983. Defendants are correct that § 1983 is not a source of substantive rights but rather a vehicle for vindication of "federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *see also Graham v. Connor*, 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). However, in *Dennis v. Higgins*, 498 U.S. 439, 450, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991), the Su-

---

**11.** The state regulatory scheme struck down in *West Lynn Creamery* subjected all fluid milk sold by dealers to Massachusetts retailers to an assessment, but distributed the entire assessment to only Massachusetts dairy farmers.

**12.** Monetary relief that is "ancillary" to injunctive relief is also permitted. *Kentucky v. Graham*, 473 U.S. 159, 169 n. 18, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citing *Edelman v. Jordan*, 415 U.S. 651, 667–68, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)).

preme Court held that "the Commerce Clause of its own force imposes limitations on state regulation of commerce, and is the source of a right of action in those injured by regulations that exceed such limitations." Accordingly, the Court held that suits alleging economic injury as a result of state regulation which violate the Commerce Clause may be brought under § 1983 and prevailing parties may be awarded attorney fees pursuant to § 1988. *Id.* at 451, 111 S.Ct. 865; *see also, Farmland Dairies v. McGuire,* 789 F.Supp. 1243, 1254–57 (S.D.N.Y.1992) (awarding attorneys fees and costs to the plaintiffs and against the Commissioner of the New York State Department of Agriculture and Markets, pursuant to § 1988, for setting minimum milk prices in violation of the Commerce Clause). Therefore, if the court finds that the PMML violates the Commerce Clause, Plaintiffs will be entitled to summary judgment on the § 1983 claim as well.

## V. *Conclusion*

In accordance with the foregoing discussion, the court will grant the PAMD's application for permissive intervention. The court finds that the PMML has not intentionally discriminated against interstate commerce; nevertheless, the court will defer ruling on the cross-motions for summary judgment at this time and allow for further development of the record by the PAMD and the other parties. Within 30 days, the parties shall submit to the court any documentary evidence that they wish the court to consider in determining whether the minimum wholesale and retail prices mandated by the PMML are justified under the *Pike* balancing test. The parties may submit therewith a supplemental brief not exceeding 25 pages in length that analyzes the evidence but does not rehash the arguments that have been decided in the instant opinion. The court

also finds that Defendants' motion to strike portions of Plaintiffs' evidence will be denied, but that only admissible evidence will be considered by the court in applying the *Pike* balancing test. An appropriate order will issue.